### In re HARRINGTON.

(Supreme Court, Appellate Division, Fourth Department. July 11, 1911.)

1. ATTORNEY AND CLIENT (§ 53*)—DISBARMENT—EVIDENCE.

   In a proceeding for the disbarment of an attorney for fraudulent conduct with respect to his client, evidence of his misconduct, though considered with certain newly discovered evidence, *held* sufficient to warrant disbarment.

   [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 74, 75; Dec. § 53.*]

---

*For other cases see same topic & §·NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. ATTORNEY AND CLIENT (§ 55*)—DISBARMENT—REHEARING—NEWLY DISCOVERED EVIDENCE.

An attorney having been disbarred for defrauding his client, newly discovered evidence, for which a rehearing was sought, consisting of an alleged conversation wherein the client, who had died before the filing of the petition, had admitted the propriety of defendant's conduct, *held* not of sufficient probative value to warrant the granting of a rehearing.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 80; Dec. Dig. § 55.*]

3. ATTORNEY AND CLIENT (§ 38*)—DISBARMENT—GROUNDS.

Where an attorney in settling a claim for his client used letters written by the defendant to his client to secure a settlement with the defendant for more than was justly due his client, his conduct merited disbarment.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 51, 61; Dec. Dig. § 38.*]

4. ATTORNEY AND CLIENT (§ 49*)—DISBARMENT—NATURE OF PROCEEDINGS.

The question in a proceeding for the disbarment of an attorney is not merely one of discipline or punishment, but is primarily whether the defendant is fit to continue the practice of law.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 48, 66; Dec. Dig. § 49.*]

On application for rehearing. Application denied.

For former opinion, see 140 App. Div. 939, 125 N. Y. Supp. 1123.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Simon Fleischmann, for the motion.

Wesley C. Dudley, Dist. Atty., and Guy B. Moore, Asst. Dist. Atty., opposed.

KRUSE, J. An order disbarring the respondent attorney was heretofore made by this court, and a motion is now made for a rehearing upon newly discovered evidence, contained in certain affidavits submitted upon this application. The only newly discovered evidence which is material or could in any view of the case affect the result is contained in the affidavit made by Curtis M. Shawkey, a Pennsylvania lawyer, the nature and contents of which will be stated hereafter.

The respondent insists that an injustice has been done him, and seems to have an impression that our decision of disbarment rests alone upon the unsupported testimony of his former client. In that he is under a misapprehension. If his disbarment rested upon her testimony alone, without any corroborating circumstances, we might reach a different conclusion. But such is not the case.

[1] In April, 1908, Almeda C. Berlin, the client, went to the office of the respondent lawyer. She went to see him about certain claims she had against Wilton C. Lindsey, arising out of five bonds, of the par value of $500 each, which were in Lindsey's possession, and an obligation against Lindsey upon which he was owing her, as she claimed, $750, making in all not to exceed $3,250. These are all the claims she had against Lindsey. She had several interviews with the lawyer. The first was on Tuesday, April 28th, as she claims, and by

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

Saturday of the same week the matter had been adjusted between Lindsey and her lawyer, so that on that day the lawyer made a settlement with her. He claims the matter between Lindsey and himself was in course of adjustment for a week or two longer than she states. That he collected from Lindsey $4,000 is not in dispute. He obtained from Lindsey a mortgage for $2,333.33 and two checks, made by Lindsey, payable to the order of Almeda C. Berlin, the client— one on the Union Trust Company of Jamestown, for $666.67, and the other on the Bank of Buffalo, for $1,000. Both checks were dated May 1, 1908, and the settlement by the lawyer with his client was made May 2, 1908. He stated that he would attend to the recording of the mortgage papers. He had her indorse the $666.67 check, and then gave her his own check for that amount upon the Marine National Bank of Buffalo dated May 2, 1908. He did not have her indorse the thousand dollar check, but claims he told her of that check, which she denies. He concedes that he indorsed her name upon the $1,000 check, but claims that in the hurry of closing up the transaction and getting the check into the bank before it closed he omitted, through an oversight, to have her personally indorse the check; that he sent his clerk with the check to the bank for deposit, where it was discovered that it had not been indorsed, and that she having left the office he indorsed her name upon the check, as he had the right to do, so he claims, because the check was his.

He asserts that she not only knew about the thousand dollar check, but that she agreed in advance that he was to have 25 per cent. of the recovery for his services, and that she understood at the time of the settlement with her that he was retaining the thousand dollars for his services, and that he gave her a receipt for a thousand dollars upon that occassion. She denied that there was any such agreement, or that she knew or understood that he had this check for a thousand dollars, or that he was retaining a thousand dollars for his services or that he gave her a receipt for the thousand dollars. On the contrary, she states that the amount of his charge was $250, and she produced a receipt, signed by him, for that amount, and which she says was delivered to her about two months after the transaction at her request.

He concedes that he made and delivered to her this receipt, and attempts to explain the transaction. He says he had no other claim against her, but states that he had done some letter writing or something of that kind, for which he had made no charge, but that she wanted a receipt and he gave her this receipt.

While it is true that the testimony of the respondent is corroborated to some extent by that of his managing clerk, his stenographer, his brother, and another witness, to whom it is claimed the client made declarations indicating that she understood the settlement as he claims it to be, yet the referee saw the witnesses and heard their testimony and the explanation of the lawyer regarding his indorsement of the thousand dollar check, and the giving of the two hundred and fifty dollar receipt, and found against him, and I think we would not be warranted in disregarding that finding. The circumstances corroborating the testimony of the client are so strong and some of the testimony

given on respondent's behalf so improbable that, even with the additional affidavit of the Pennsylvania lawyer, I think the findings of the referee must stand.

Shawkey, the Pennsylvania lawyer, testifies to certain declarations made by the client to him in the course of a consultation. She stated to him, so he says, that she desired to commence proceedings against Harrington (the respondent) to recover a part of the thousand dollars obtained in settlement of the collection; that he told her that on her own statement she had agreed to pay that sum, or at least 25 per cent. of the amount collected, and whether it took an hour or six months of Harrington's time it did not make any difference; that she might find some lawyer in New York, but he doubted if she could find one in Pennsylvania, who would undertake to recover any part of that fee, under the circumstances as she stated them.

[2] It is unnecessary to refer in detail to all the statements contained in the affidavit. It is sufficient to say that, if the interview took place as he claims, it would indicate that she understood the transaction to be as the respondent claims. It is unfortunate that this information was not disclosed by Shawkey during the lifetime of the client, if it was to be disclosed by him at all. She has died since the hearing before the referee, and her attention was not called to the interview which it is claimed she had with Shawkey, presumably because the information had not then been disclosed by him. But laying aside the question of the propriety of his disclosing this confidential information, and regarding it as competent and proper evidence, I am not persuaded that it is deserving of sufficient credit and probative force to change the result of the former hearing.

The respondent claims that the client was a designing woman; that she entrapped him into the giving of this receipt; that at the very first interview he became suspicious of her; that she became faint and asked for a drink of whisky; that he asked his clerk to get her a drink of water, and told the clerk to stay there and be present at every interview with her thereafter, and the clerk testifies to various subsequent interviews. It seems strange that under these circumstances he should not have dismissed her, or, if he really believed that she would misrepresent any arrangement he might make with her or otherwise take an unfair advantage of him, that he did not protect himself by reducing the contract of employment and the settlement to writing and have her sign the writing. And still more strange does it seem that, after his suspicions had been thus aroused, he should, two months after the final settlement, give her a receipt for $250, for nothing, as he claims; for, as he testifies, his only claim was for services for which he had already given her a receipt for a thousand dollars.

[3] There is another aspect of this case which should not be lost sight of. Almeda C. Berlin, the client, and Lindsey, against whom she held these claims, had been intimate. She evidently expected that he would marry her, but he did not. He married some one else. But their relations continued as before, at least to some extent. She had letters from him of such a character that he might well not wish to have their contents made public. Some of these she brought to

the office of the respondent upon the occasion of her first visit there. She told the respondent of her relations with Lindsey. He examined the letters. Both she and the respondent knew at that time that she had no claim against Lindsey for breach of promise of marriage, or in any way arising out of the relations theretofore existing between her and Lindsey, to which the letters related, as she had theretofore given to Lindsey a general release, covering all those matters, and of which the respondent was made aware. While I have no doubt that both the respondent and the client were well aware that she had no claim against Lindsey, except for the bonds and the amount owing her upon the obligation referred to, I am convinced that both intended that these letters should be used to bring about a more speedy and advantageous settlement. Not that she expected to get more than what was justly her due, but I am well satisfied that the respondent did use the letters to compel Lindsey to pay more than he otherwise would have paid or could legally be required to pay. The referee has found that he used the letters for the purpose of enhancing the claim made for his client, without her knowledge or consent, and surreptitiously appropriated the $1,000 check to his own use; and with that conclusion I am not inclined to disagree. Whatever doubt there may be as to whether she had knowledge of the use to which the letters were being put, I am in entire accord with the opinion of the referee that she did not know that the respondent had succeeded in enhancing the claim and had obtained the $1,000 check.

Assuming that the letters were used for the improper purpose, and with her knowledge and consent, or even at her request or by her direction, how does that excuse the lawyer in so using them? It seems that as late as the hearing before the grievance committee of the bar association, more than a year after the settlement, the respondent had some of the letters in his possession. He concedes that they should have been delivered to Lindsey, but claims that his client did not deliver them to him until about two weeks after the settlement with Lindsey; that she told him to keep them, that they might come in handy; that he insisted they should be delivered; and in his testimony before the grievance committee he characterized this transaction relating to the additional letters as nothing but blackmail, and in response to the question on whose part, said, on the part of Miss Berlin. I think the whole transaction relating to the letters may be characterized as of that nature. Assuming that she concocted the scheme, I am not aware of any rule in law or good morals that permits a lawyer to advise, aid, and assist a client in carrying it through and obtain from another what does not belong to the client, divide the spoils between himself and his client, and he escape condemnation or punishment.

[4] The question here is not merely one of discipline or punishment, but primarily one of fitness of the respondent to continue the practice of the law. Taking the view most favorable to him of the transaction relating to the letters, I think it is of such a character as of itself to show his unfitness to continue in the practice of the law.

I think the application for a rehearing should be denied, and that the order of disbarment should stand. All concur.