## *In re* MARSHALL.

(In Banc. Nov. 30, 1931. Suggestion of Error Overruled March 7, 1931.)

[138 So. 298.   No. 29418.]

See, also, 134 So. 67.

Jeff Truly, of Fayette, J. H. Currie, of Meridian, W. C. Sweat, of Corinth, Lemuel A. Smith, of Holly Springs, and W. S. Welch, of Laurel, Grievance Committee, State Bar Association, Louis M. Jiggitts, Secretary, and George Butler, all of Jackson, for appellant.

T. J. Wills, of Hattiesburg, and Charles F. Engle, of Natchez, for appellee.

Argued orally by **Jeff Truly, George Butler** and **W. S. Welch,** for the Grievance Committee, and by **Jeff Wills** and **Chas. Engle** and **Ed Franklin,** for respondent.

## PER CURIAM:

The respondent, Carl Marshall, a licensed and practicing attorney at law, has been charged by a special committee of the State Bar Association with offenses for which the said association has suggested that said respondent be disbarred. The charges are set forth in a lengthy, narrative statement, somewhat informal in character, but containing enough in allegations of fact to make out, if established by the evidence, a charge of misconduct in the nature of blackmail, and the committee does in express words charge said specific offense against the respondent.

The information filed by the committee was duly answered by the respondent, and a considerable mass of testimony has been taken and placed of record. This record comprises three large volumes, all of which have been read and studied by every member of the court. As a result thereof, more than one judge has written and

submitted a statement of the facts, and these have been compiled by all the judges, acting together, into the following final statement and opinion. Others than the respondent are charged with participation in the respondent's misconduct, but, so far as possible, the statement of the facts in respondent's case is made so as not to include the evidence relative to the alleged connection of any other therewith, leaving such facts to be stated in the opinions rendered in said other cases.

The municipal authorities of the town of Durant had adopted the necessary orders and had taken the other proper steps for the paving of Jackson street in said town, and the contract therefor was let on the first Monday in July, 1929, to Dunn Construction Company. The paving material to be used under this contract is a material commonly known as Warrenite. There is a patent upon some essential part of the process used in this type of paving, which patent is owned by Warren Bros. Company, whose head office is in Boston, Massachusetts. The said Dunn Construction Company is one of the licensees for the use of the said Warrenite process; there being many other licensees throughout the various parts of the country.

Sixteen persons owning property abutting on said Jackson street had objected, and were still objecting, to the pavement of the street in the manner proposed, because, as alleged by them, the costs therefor which, in part, would be assessed against the said abutting property, were excessive as compared with the comparative value of the property before and after the completion of the pavement. These objectors had employed the firm of Howie, Howie & Latham to contest this paving project, and, if possible, to prevent the letting of the contract; and, if this could not be done, then to take the necessary legal steps to have the contract annulled.

Upon an examination of the record of the proceedings of the municipal council, the said attorneys came to the

conclusion that the said proceedings contained no defects, and that upon the face thereof no relief for their clients could be obtained from the courts. Hoping however, that something could be found or would transpire, outside of the existing record, which would give some opportunity to attack the proposed contract, Latham, the member of the said law firm who was handling the matter for the firm, attended the letting of the contract on the said first Monday in July, 1929. On this occasion, and after the contract had been awarded to said Dunn Construction Company, Latham came in contact with one Marvin, a discharged employee of Warren Bros. Roads Company, another licensee of the Warrenite process, and which latter company was a subsidiary of the Warren Bros. Company, the owners of the said patented road process. Marvin had been employed as the manager, or in some such capacity, of the Jackson office of Warren Bros. Roads Company, and upon his discharge had retained in his possession a considerable file of letters and papers appertaining to the business of said companies. Marvin, on the occasion mentioned, informed Latham of his possession of these files, and that an examination of them would, in his opinion, disclose violations of the law by these companies, particularly of the anti-trust laws of the state, and which violations as a Warrenite licensee would include said Dunn Construction Company, the Durant contractor. This information drew at once the alert interest of Latham, and it was arranged that Marvin should bring to Latham's office on the next day some of the more important of said papers.

As promised, Marvin produced the papers mentioned, and delivered to Latham, out of the said files, an amount of papers which is generally spoken of in the record as being sufficient to fill the average size brief case, commonly in use by lawyers. Upon an examination of these papers, together with the explanation made by Marvin of

the meaning of some of them, Latham came to the con-
clusion that violations of the anti-trust laws were there-
by disclosed, and also that these papers revealed trade
or business information or secrets which would be det-
rimental to the interests of Warren Bros. and Warren
Bros. Roads Company, and allied companies, if placed
in the hands of, and were used by, competitors of said
companies.

Latham thereupon brought the matter to the attention
of one of his partners, and, after going over the said dis-
closures, it was decided to take the matter at once to the
Attorney-General, with request that the Attorney-Gen-
eral permit an anti-trust suit to be brought against War-
ren Bros. Company, and also against Dunn Construction
Company, and the other licensees of Warren Bros. Com-
pany who were or had been operating in the state. The
Attorney-General, without any examination of the
papers, stated that his office had already been conducting
an investigation along the same general lines, and had
in contemplation the filing of such a suit, which was in
the hands of E. C. Sharp, an attorney associated with the
Attorney-General for that purpose; and a tentative ar-
rangement was then made with the Attorney-General for
the filing of the suit, the said attorneys, Howie, Howie
& Latham, to be associated therein with Sharp and the
Attorney-General. The latter requested, however, that
the suit should not be filed at that time, because the
Attorney-General's office was then under investigation,
and it was thought by him best to delay any suits of this
nature until after this investigation was at an end.

In contemplation of the filing of the anti-trust suit,
when later the Attorney-General would give the promised
permission, Latham proceeded in the attempt to prepare
a bill, but, not being satisfied with his own efforts, he
employed E. N. Floyd, a lawyer of experience in such
matters, to draw the bill for him. Latham furnished to

Floyd all the papers he had, and also procured the attendance of Marvin at conferences with Mr. Floyd to furnish the needed interpretation of the papers and to give other oral information. Mr. Floyd prepared the bill and furnished Latham with copies of it. There is some uncertainty among the witnesses as to when these copies were furnished, but it is fairly ascertained that the copies were in the hands of Latham some days before July 24, 1929.

In the meantime, and while the above-mentioned work was going on, Latham conceived the idea and proceeded to attempt its execution, that he could collect contributions from the competitors of the Warren companies for the prosecution of said suit, upon furnishing the said competitors with the information contained in the Marvin files not only in respect to anti-trust violations, but also the trade secrets and business methods of the Warren companies disclosed by said files. Among others approached by Latham in pursuance of this attempt was Mr. W. K. Herrin, the general agent in Mississippi for a competing paving material company, and to whom at a later place in this statement further reference will be made. As a result of these efforts, the knowledge that such efforts were being made got into the possession of those engaged in the paving business, and as a further result some sort of a decoy was arranged for the entrapment of Latham in a hotel in Louisville, Kentucky, where, on the pretense that parties would there meet him to make a deal about the papers, such papers as he had there were forcibly taken away from him, but it transpired that he had taken to the place of attack copies only, and not any of the originals.

Among the copies there taken, however, was a copy of the proposed anti-trust bill, and that this was before July 24, 1929, is disclosed by the fact that at a meeting on that date held in the office of Warren Bros. Roads Com-

pany in Memphis a copy of the proposed anti-trust bill was in the possession of the Warren Bros. representatives at that meeting. How they got it from those who took it in Louisville is not disclosed, but that it was a copy of the Floyd bill is shown by the testimony of Mr. Cowan that there was such a bill in the hands of the Warren interests at said July 24th meeting, and by the testimony of Mr. Floyd that he delivered to Latham two or more copies of the bill on the day before Latham departed on his trip to Louisville.

But Latham did not confine his canvassing campaign to the contracting fraternity. He ventured to approach a distinguished lawyer of Clarksdale, former Governor Brewer, and laid before him a proposition so extraordinary in its nature that Governor Brewer not only rejected at once the suggestions made, but told about the occurrence, so that the Warrenite interests soon learned of it, and at their request Governor Brewer and Mr. Herrin attended the said conference at Memphis on July 24th. At this meeting there were present George Crafts, general counsel of the Warren Bros. Company, and who is also general counsel of Warren Bros. Roads Company, R. C. Cowan, counsel in Mississippi for the latter company, and Elmer Reis, an executive employee of the said company with offices in Memphis. Crafts, in his testimony, gives the following resume of what Governor Brewer informed them at that meeting:

"In my conference with Governor Earl Brewer at Memphis, . . . Governor Brewer informed Mr. Cowan, Mr. Reis and myself that Sam Latham, an attorney of Jackson, Mississippi, had secured from a Mr. Marvin, a voluminous file of papers, correspondence, letters and documents, which Mr. Marvin had retained after he had been discharged from the employment of Warren Brothers Roads Company. Governor Brewer further advised us that Mr. Latham approached Mr. W. K. Herrin

of Clarksdale, Mississippi, representative for the Kentucky Rock Asphalt Company, soliciting from said Herrin a contribution of five thousand dollars. Governor Brewer said that Mr. Latham held out as an inducement to Mr. Herrin that he would give Mr. Herrin free access to the files of Warren Brothers Roads Company, which he had in his possession, for the purpose of securing any information which he might desire; that he was planning to attack contracts of Warren Brothers Roads Company in the state of Mississippi and had already been retained to attack one contract involving the patented material of Warren Brothers Roads Company at Durant, Mississippi; that he intended to institute other suits of like nature; that he expected to make very substantial profits in selling stock of Warren Brothers Company short and thereafter launch a newspaper campaign calculated to depress the stock of the company; that he would be very glad to tip off Governor Brewer so that he could make some money in dealing in the stock of Warren Brothers Company. Brewer also said that Latham told him that he expected to canvass the contracting fraternity operating in Mississippi and expected to receive substantial contributions, which would give him a handsome return for his efforts as above outlined, and that he was going to try and secure the permission of the Attorney-General to the bringing of an anti-trust suit. Governor Brewer further stated that Mr. Latham asked him if he (Brewer) would not associate himself with Latham in his scheme and thought it would be very profitable to Brewer if he did so.''

Without detailing further of that meeting at Memphis, the result of it was that the Warren Bros. Company gave notice to all its associated companies or contractors in Mississippi, so that they might cover against the threatened attack, and Crafts, the general counsel, came to Jackson and employed a prominent law firm at the capital

to defend the said suit, if and when brought, and in the meantime to take some steps, if possible or advisable, to recover the papers then in the hands of Latham and Marvin, the latter object being the one at that time foremost in view; but the rapidity with which events subsequently transpired apparently forestalled any separate steps in reference to the papers.

At this time a procedure of absorbing state-wide interest was in the height of its progress before the House of Representatives then in session. A prosecution looking towards the impeachment of the Attorney-General of the state was nearing the stage when a vote would be taken by the House. The respondent, Marshall, was the attorney for the house committee which was prosecuting the charges against the said officer, and the respondent was at the summit of power and popularity as an attorney and skillful advocate. In a few days following the meeting at Memphis above mentioned, it had become perceptibly probable that the Attorney-General would be forced out of office, in which event it was regarded as certain that the respondent would be of commanding influence in affairs such as was the Warren Bros. matter then in the making.

Sensing the significance of this situation, the said Latham approached respondent and requested him to join the firm of Howie, Howie & Latham in the said suit, which engagement respondent tentatively accepted. This tentative employment or engagement was made apparently about a week or more before the resignation of the Attorney-General, which resignation was of date August 19, 1929. The proposed connection of respondent with the matter came in a manner not here necessary to detail, and soon thereafter, to the knowledge of the Memphis office of Warren Bros. Roads Company, and also to Mr. Cowan, the Mississippi attorney of said company, and the said Memphis office advised Crafts, general counsel,

at Boston, by long-distance telephone, of respondent's connection with the case, and the suggestion was made in this communication that contact should be made with respondent with a view of obtaining some relief from a situation which those concerned for the defense had evidently come to regard as being really serious. There is a conflict in the evidence as to who originated the suggestion that a meeting be held between Crafts and respondent, but, so far as respondent's case is concerned, it is sufficient to say that, in response to the telephone message aforesaid, the said Crafts, general counsel, stated that he (Crafts) would be in New Orleans on August 30, 1929, and that a meeting between him and respondent might be arranged for that day. Respondent was thereupon advised, but by whom or how does not clearly appear, of the place and date of the proposed meeting, and respondent decided to attend, as suggested.

When respondent was first invited into the matter as aforesaid, his time was so fully occupied with the said impeachment proceedings that he had but little opportunity to look into the merits of the Durant case. Although a copy of the proposed bill as prepared by Floyd was furnished him, his available time to examine into the matter was so limited that he now says he has no recollection of ever having seen such a bill. However, the proof is that he did in a casual manner consider the proposed suit and had about come to the conclusion that the prospects of a successful prosecution were not favorable, so that, according to his evidence, at the time he received word that Crafts desired to discuss the matter with him, he had about determined not to go further with it.

When, however, he learned that Crafts would meet him in New Orleans, he at once notified Latham that he would attend and would see what could be done. He states that he was impelled to further efforts in the matter because

of his close personal friendship and association with a son-in-law of one of the objecting property owners at Durant. Indeed, it clearly appears that through his friendship and daily association for several months theretofore with said son-in-law, who was employed in the capacity of an expert accountant, by the house committee to assist respondent in the impeachment proceedings, respondent had in a general way become acquainted with the paving controversy at Durant and with Latham's connection therewith. For instance, respondent knew of the trip which Latham made to Louisville and of Latham's report of his unpleasant and profitless experience on that adventure; although it must at once be added here that respondent had no part in the excursions of Latham, and on more than one subsequent occasion expressed, in his interviews with Crafts, his disapproval thereof.

All the foregoing with reference to Latham's activities and of what Crafts had learned of them, and of the file of papers and the uses to which they were being put, and of the manner that respondent had been brought into the matter, and his knowledge and views of it, has been sketched in order that the mental attitude of Crafts when he reached the conference at New Orleans may be understood, as well as that of respondent when he and Crafts met there on August 30, 1929. Without a view of the recited events, the subsequent conduct of both these men would be inexplicable, especially that of Crafts, who when he reached the meeting place seemed to have become infected with a trepidation or fear for the safety of his clients in the matter in hand, bordering almost on panic; whereas, whether respondent approached the meeting expecting but little beyond a hard task of obtaining some release for his clients from the Durant paving burden, or whether he went there to accomplish what he did afterwards accomplish, it is certain that he soon found that

the said general counsel was not there to drive a hard bargain, but was ripe for a shakedown, if only there were applied upon and against him the willingness and ability to accomplish that end.

When the respondent and Crafts had their meeting in New Orleans, which was in Craft's room in the Roosevelt Hotel, Crafts proceeded to state what he had learned about the wrongful possession by Latham, as was asserted by Crafts, of the file of papers belonging to the Warren interests and of the wrongful and injurious use and further threatened use of them by Latham, and that he (Crafts) was anxious to take such steps as would secure the return of all said papers and a discontinuance of the activities of Latham and of those associated with him therein. Respondent stated in reply to all this that he had not been a party to those performances by Latham, and did not approve those methods, although he could and did well appreciate, as he then stated, that those activities "might be very injurious to Warren Bros. Roads Company;" that respondent's chief interest, in fact, his only direct interest, was in behalf of the parties represented by him, through Latham, namely, the objecting property owners at Durant and to secure such relief as they were entitled to have. Crafts then stated that he had no direct interest in the Dunn Construction Company or in the Durant contract, that his interest and object was rather as above stated, but, if it were necessary to get rid of that contract as one of the means to the ends which Crafts desired to accomplish, that is to say, a clean-up of the whole matter, he would undertake to get an agreement from the Dunn Construction Company to cancel that contract, and thereupon Crafts asked respondent more particularly about the objectors, and here we quote from Crafts' testimony on this point: "I asked Mr. Marshall if there was general opposition to this contract or if it was confined to a few property owners. As

I remember it, Mr. Marshall said there were only a few property owners opposed to it. I believe a Mr. Beall was the chief objector as he claimed that the proposed assessment against his property was out of proportion to the benefit and was in excess of the assessments on other property. I believe I asked Mr. Marshall if Mr. Dunn should purchase Mr. Beall's property if that would relieve the situation. Mr. Marshall stated that he didn't know.'' Respondent does not deny the substantial accuracy of this quoted portion of Crafts' testimony.

The above gives a view of the general course of the first conference between these two attorneys in New Orleans, and shows that the attitude of the respondent, in the approach, was chiefly that he wanted a cancellation of the Durant contract, while that of Crafts was that he was not particularly interested in the Durant contract, but that what he wanted was the recovery of the papers and files in the possession of Marvin and Latham, and a complete surcease of the activities of Latham and his associates on account thereof, or on account of any information possessed by them. So anxious was Crafts along the latter line that he finally volunteered the suggestion that he would be willing to pay for his clients the sum of fifteen thousand dollars to accomplish the purposes so stated by him. The respondent states that this offer by Crafts took him completely by surprise at its liberality, or, to use respondent's own words, it came near knocking him backwards from his chair. But respondent soon recovered from his surprise, and, giving no indication thereof, he replied that, while he had just been brought into the case and could not speak with authority on the proposition, he was satisfied that his clients would not consider so small a sum and would demand at least one hundred thousand dollars. Respondent now states that this reply by him was facetiously made, but whether or not is the better disclosed by the facts of subsequent developments.

The termination of the first New Orleans interview is summarized by Crafts in his testimony as follows: "At the conclusion of my conversation with Mr. Marshall it was understood that I would see Mr. Dunn and find out what his attitude was with reference to the Durant contract and that Mr. Marshall was to post himself further concerning Mr. Latham's activities and what could be done to secure a general termination of Mr. Latham's activities, the restoration to Warren Brothers Roads Co. of their property and a satisfactory disposition of the Durant controversy." There is no substantial difference between the versions given by Crafts of this first New Orleans interview and that given by respondent; that is to say, upon essentially material points.

This interview at New Orleans was on Friday. On the following Monday, September 2, 1929, respondent returned to Jackson and reported to Latham, but just what information in detail was given to Latham by respondent is not definitely disclosed by the record. At that time the special 1929 session of the Legislature was about to adjourn, and it was known that an act would be passed placing the attorney-general on a salary, abolishing all fees. Laws 1929 (Ex. Sess.), chapter 15. This act was passed on September 4, 1929. On said Monday morning, September 2, 1929, the attorney, Sharp, who has heretofore been mentioned, went to the new attorney-general, who had just entered upon his office, and stated that, in connection with the firm of Howie, Howie & Latham, he (Sharp) had been employed by the former Attorney-General to bring an anti-trust suit against Warren Bros. Company and allied companies, and requested permission of the new Attorney-General to file the said suit at once. This permission was given, and Sharp telephoned forthwith to Howie, Howie & Latham for the bill of complaint, copies of which were in the office of Howie, Howie & Latham, with the information that the Attorney-

General had given permission for the immediate filing of the suit. Latham hurried to respondent with this news, and respondent immediately got into communication with the Attorney-General through another, the identity of whom it is not here necessary to mention, and procured the Attorney-General to withdraw his said consent, on the ground that respondent was handling the case and that the entire matter was in process of settlement.

Having thus forestalled what would have interrupted, and perhaps may have entirely frustrated, the negotiations then pending with Crafts, respondent on the following day again met Crafts at New Orleans, that is to say, on Tuesday, September 3, 1929, and we again quote from Crafts' version of that interview, the respondent not materially controverting that version: ''I next saw Mr. Marshall in New Orleans I believe on Tuesday after Labor Day, 1929. Mr. Marshall advised me that he had talked with Mr. Latham and his associates with reference to the matters in controversy and that a general settlement could not be secured except upon the payment by Warren Bros. Roads Co. of one hundred thousand dollars. He said that he had done all he could in the matter but that he wasn't able to make much headway. . . . As a result of the second conference there was no definite agreement with Mr. Marshall and myself as to what sum of money we were willing to pay. I told Mr. Marshall that we might possibly be willing to go as high as twenty-five thousand dollars to secure the termination of Mr. Latham's activities and the return of the property of the company and Mr. Marshall stated that it would also be necessary to secure a satisfactory adjustment of the Durant contract. Nothing was definitely agreed upon at either of these New Orleans conferences as it was necessary for me to take up terms of any settlement with my clients and also ascertain Mr. Dunn's position with reference to the Durant contract and Mr. Marshall advised

me that he would have to take up matters further with Mr. Latham and his associates. . . . At the termination of my second conference with Mr. Marshall in New Orleans, I advised Mr. Marshall that I was going to Memphis for two or three days and that if he desired to communicate with me further concerning the matters discussed, he could get in touch with me by telephone at the Peabody Hotel.''

Respondent returned to Jackson and conferred with Latham, informing the latter that the negotiations had proceeded to the point where it appeared probable that a settlement could be effected in the payment by Warren Bros. of fifteen thousand dollars, the cancellation of the Durant contract, and the return to Warren Bros. of all the papers received from Marvin. This outline of settlement was accepted by Latham, but he urged that, if possible, the cash settlement should be raised to eighteen thousand dollars because it would be necessary, as Latham represented, to pay some money by way of expenses to the municipal authorities of the town of Durant to get their consent to the cancellation of the Dunn contract. Thereupon, and on Thursday, respondent telephoned to Crafts in Memphis, and to quote again from Crafts' testimony: ''Mr. Marshall called me at the Peabody Hotel in Memphis, I believe on September 5, 1929. After some discussion in which Mr. Marshall advised me that his clients were holding out pretty strenuously for one hundred thousand dollars, it was finally agreed that Mr. Marshall and I would recommend to our respective clients the settlement on the basis of eighty thousand dollars.'' The respondent on that same afternoon departed, in company with others, to Memphis, taking along with him a brief case filled with papers, which had been taken by Latham from a safety deposit vault in a bank, and delivered to respondent as being the papers and all the papers that were involved.

Respondent met Crafts on the following morning, the 6th, and, according to Crafts, the settlement was fully reviewed and confirmed, to-wit, that all the papers in the possession of Latham or Marvin should be returned intact; all activities of said Latham and his associates should cease; the Dunn contract at Durant should be wholly canceled without any expense to the property owners; and Warren Bros. should pay, in consideration of the features just mentioned, the sum of eighty thousand dollars. Crafts thereupon put his employee Reis to work, to check up the papers, but it was found that only a small part of them had been brought for delivery. This fact aroused the protests of Crafts, and was displeasing to respondent, who supposed that Latham had in fact given him all the papers. Respondent got in communication with Latham, and directed him to see to it that the remainder of the papers still held by Marvin was delivered to Reis, who was at once sent to Jackson for that purpose. On the morning of the 7th, Reis advised Crafts by telephone that all the remaining files and papers had been delivered to him, and soon thereafter, about ten o'clock, Crafts paid to respondent in cash six ten thousand dollar bills, and four five thousand dollar bills, making a total of eighty thousand dollars, and respondent delivered to Crafts the brief case containing the papers received from Latham. Respondent immediately came to Jackson by automobile, and thence to Gulfport, where Latham was awaiting him, and there respondent reported that he had succeeded in collecting eighteen thousand dollars. He delivered to Latham thirteen thousand dollars retaining five thousand dollars as his (respondent's) fee, but nothing was said to Latham about an additional collection of sixty-two thousand dollars.

Respondent's version of the Memphis settlement is this: That about the time when on Thursday, the 5th, he

was ready to communicate further with Crafts at Memphis by telephone on the issue of the final terms of settlement, he (respondent) was approached by a man named Jack Wilson, who came just at this juncture to respondent's room. This man Wilson, respondent says, was a person that he had casually met around Jackson, and who, as he supposed, was interested in some way in roads, either in the construction of roads or else in road legislation. He describes Wilson as a "typical road man," fairly well dressed, of robust size and middle age, but without other particular distinguishing characteristics. He says that Wilson introduced his business in making the call to respondent's room by the statement that he (Wilson) understood that respondent would soon have a meeting with Crafts or with the Warren road people, and that these people were due to make a settlement also with him (Wilson) about certain matters understood between him (Wilson) and the Warren interests, and that the amount they were due to pay over for him (Wilson) would be from sixty-five thousand dollars to seventy-five thousand. That Wilson requested respondent, in view of the fact that respondent was soon to be settling another matter with the Warren interests, to collect for him (Wilson) at the same time the said amount due to be paid to Wilson. Respondent says that Wilson did not go into any details respecting the nature of his claim or demand, or whatever it was, against said Warren interests, and that respondent did not request him to do so, supposing that the matter was fully understood at the other end of the line. Respondent says that he does not recall having mentioned Wilson's name to Crafts at Memphis, or that the Wilson matter was the subject of any discussion either at Memphis or in any preceding telephone conversation with Crafts, but says he supposed it was understood that sixty-two thousand dollars of the money paid to him was for Wilson, and that, Wilson hav-

ing been present at Memphis on the morning of the 7th when the money was paid by Crafts, he (the respondent) soon thereafter and on the same morning paid over to Wilson sixty thousand dollars of said money, and a few days later at Gulfport had his secretary to pay over to Wilson the remaining two thousand dollars; the balance of eighteen thousand dollars having already been accounted for to Latham. Respondent does not claim that Wilson was his client in this matter, or that any such relation then or at any time existed between them. In fact, he expressly states that his contact with Wilson was more nearly in the nature of an accident, and that he performed the service mentioned purely as a casual and gratuitous accommodation. No receipt or other written memoranda was executed between Crafts and the respondent, and the transaction rests wholly in parol. Wilson was not introduced as a witness, nor did respondent or any one else seem to know his whereabouts, except that one witness testified that Wilson had stated on the occasion of a later visit to Gulfport that he was departing for an indefinite address in South America.

The respondent further testified that a few days after he paid to Jack Wilson, in the city of Memphis, the sum of sixty thousand dollars in bills of large denomination, Wilson came to Bay St. Louis and requested respondent's assistance in securing change for the bills; that he secured change for a part of these bills at Bay St. Louis, and then accompanied Wilson to New Orleans, where, at the Whitney Central National Bank, the balance, amounting to forty or forty-five thousand dollars, was exchanged for bills of smaller denominations.

For the purpose of completing the picture as reflected by the record, it may be here stated that the evidence shows that, after the respondent's private secretary had filed his federal income tax report for the year 1929, an amended return was prepared and filed, showing the

receipt by the respondent from "Warren Bros. Co., Boston, Massachusetts," as income, of the sum of eighty thousand dollars, from which there was deducted as "expenses paid," the sum of fifteen thousand dollars leaving sixty-five thousand dollars subject to taxation. The testimony is to the effect that, after this amended report was prepared, it was presented to respondent by his private secretary at a time when he was seriously indisposed and practically incapacitated for the transaction of business, and was signed by him, without reading it, at her instance and upon her assurance that it was all right. According to the testimony of the public accountant who prepared the report, it was prepared by him at the instance and under the direction of a man who introduced himself to the accountant as J. C. Wilson, and who paid him a cash fee of one hundred dollars for preparing the report. There is also testimony to the effect that respondent's private secretary was called into conference with the accountant and Wilson at the time the amended return was prepared, and that Wilson paid to this secretary in cash the amount of the taxes calculated to be due on sixty thousand dollars shown on this amended return, amounting to something over nine thousand dolls, and that this sum was placed in respondent's safety deposit box at a bank, and the entire amount of taxes required by said return was afterwards paid by respondent in quarterly payments.

There are no difficult points of law involved in this case. The offense of levying blackmail is variously defined by the courts, some of them contenting themselves by the simple denomination of it as "hush-money." So far as concerns a case such as this, it is enough that an attorney, availing of the fears and credulity of an opposite party, knowingly and willfully collects from that party a sum of money beyond that which the law would allow the attorney to collect, even if everything claimed

against the victim as facts were established as absolutely true. And it is not necessary that the attorney should resort to any threats—it would be, for instance, none the less robbery if the victim, were found down and helpless, than if the victim had at the same time been knocked down and rendered helpless. The principle is illustrated by such cases as In re Harrington, 146 App. Div. 219, 130 N. Y. S. 920; Varnum's Case, 28 Colo. 349, 64 P. 202; and Meighen's Case, 51 S. D. 459, 214 N. W. 848.

In the case here in hand, leaving aside for the time being the Jack Wilson issue, and looking solely to the eighteen thousand dollars admittedly paid for the Durant property owners: Respondent represented no clients except the sixteen property owners at Durant. Warren Bros. Company or Warren Bros. Roads Company had done no wrong to said clients, the said sixteen property owners, unless by a violation of the anti-trust laws of the state. Admitting then that the said companies had violated the said anti-trust laws, and that the said sixteen parties were entitled to recover in a proceeding thereunder the full damages provided by law therefor, what was the full amount of that recovery? The amount is definitely fixed by the statute, section 3440, Code 1930, as follows: "Any person, natural or artificial, injured or damaged by a trust and combine as herein defined, or by its effects direct or indirect, may recover all damages of every kind sustained by him or it and in addition a penalty of five hundred dollars, by suit in any court of competent jurisdiction; said suit may be brought against one or more of the parties to the trust or combine and one or more of the officers and representatives of any corporation a party to the same, or one or more of either. And such penalty may be recovered in each instance of injury. All recoveries herein provided for may be sued for in one suit."

It will be seen that the recovery is limited to a penalty of five hundred dollars for each person injured, or for the sixteen persons in this case, to a total of eight thousand dollars. In addition, the actual damages may be recovered, but in the case in hand there could be no damages except the paving taxes against the objecting owners on account of the paving contract, and that could not be counted here, for it was one of the express terms of the settlement made in connection with the payment of the money to respondent in this case that the paving contract would be canceled. And thus, so far as the settlement was concerned, the damages disappeared—there were none left to be recovered. The only other element left that could serve as a basis for calculation to cover the difference between the eighteen thousand dollars paid to respondent and the eight thousand dollars which, under the law, the Durant clients could have recovered, that is to say, the balance of ten thousand dollars, is to consider that ten thousand dollars balance as a payment to be made to Marvin for the papers recovered from him.

But Marvin was paid only one thousand seven hundred fifty dollars, which, added to the eight thousand dollars, makes nine thousand seven hundred fifty dollars, still leaving a difference of eight thousand two hundred fifty dollars, which respondent took beyond any warrant of law for so doing, and the courts hold that this is equivalent to blackmail; and here we might leave this matter, without saying more.

It will be suggested, however, that the inquiry cannot stop at the point to which the last paragraph has brought the case; because, first, the matter of the amount to be paid Marvin was handled entirely by Latham, and, it not being shown that respondent knew how much was to be paid Marvin, respondent should, under the presumption of innocence, be allowed the benefit of an assumption that all of the remaining amount above eight thousand

dollars was to be paid to Marvin; and, second, it not being shown that respondent knew of the exact number of objecting property owners, he should be allowed the benefit of an assumption on his part at the time of this transaction that there were enough in number to absorb the eighteen thousand dollars at five hundred dollars each. As to the first suggestion that it might have been assumed that Marvin was to receive ten thousand dollars, we think it is enough to say that no such an amount or any amount beyond what was paid him could reasonably be assumed as being due to go to an unfaithful employee who was holding in his possession, and delivering to others, papers and documents confidential and private in their nature, and which were obtained by him by virtue of his employment, and which rightfully should have been turned over to his employers when this employment ceased. And as to the second suggestion it has already been shown that respondent stated to Crafts that there were "only a few property owners opposed" to the Durant contract. Sixteen are more than a few, and, if respondent did not in fact know the number, he should, in view of this statement by Crafts, have cleared up this vital point by his own testimony on that issue, which he did not do, or anywhere undertake to do.

But let us pass this point and say for the present that the two suggestions mentioned may be accepted as sufficient to exculpate respondent in respect to the eighteen thousand dollars, what then about the remaining sixty-two thousand dollars? That additional amount cannot at all be justified, and is not attempted to be justified, on any sort of assumption that it was for the case of the Durant clients, the only clients whom respondent represented; and must be gotten rid of in this case, if at all, by an acceptance of the tendered explanation that it went to Wilson, and was so understood and paid over for him at the time.

It is testified to by a number of witnesses that a person, of a character uncertain according to the record, who claimed the name of Jack Wilson, was occasionally in Jackson on business of an uncertain nature, and that this man was in Memphis on the 6th and 7th of September; but the fact that he was there on those days exposes a fatal weakness in the claim of any pay-off to him through the medium of the respondent; for there is no pretense of any explanation of why it was that, being in the same city and in the vicinity of the same hotel with the pay-off man, Wilson did not then and there deal directly with the said pay-off man, rather than risk delay, misunderstanding, and possible loss in the use of a third party as a conduit, especially when the third person had not sufficient information about the payee's claim or demand to enable him to handle the matter intelligently.

But this is not all by any means. It will be remembered that, when respondent and Crafts concluded their second interview at New Orleans, on September 3rd, Crafts had raised his offer to twenty-five thousand dollars, and respondent was still holding out for one hundred thousand dollars. At this time Wilson had never appeared on the scene, and was not even in the mind of respondent. On the 5th respondent and Crafts, in the telephone conversation of that date, agreed on a settlement of the matters which had been the subjects of their previous personal interviews at eighty thousand dollars; the name of Wilson or any new matter still not having been mentioned between them, and there being not a word to show that, at the time of that telephonic agreement, Crafts knew or had any intimation that Wilson was anywhere involved or that Crafts knew of such a man or of his whereabouts. The interviews at Memphis went on, and throughout these interviews Wilson's name was not mentioned, nor was his alleged claim discussed either as to its nature or its amount; the pay-off transpired and still no mention of Wilson.

But we will not proceed further with the dissection. That the payment of such a large sum of money was made, in the manner or for any such undisclosed purpose as set out and insisted upon in respondent's explanation on the Jack Wilson issue, is contrary to all the logic of experienced reason and against every rational probability when weighed in the scales with the lessons derived from sensible observations of normal human nature. It is a narrative of such utter improbability as to amount to a practical impossibility, and with profound regret, because of the consequences, we must announce that we unanimously reject it. The frame will not fit the picture —it cannot be made to fit.

This leaves the sixty-two thousand dollars unexplained in this record, so far as the case of the respondent is concerned, and, so far as he is concerned upon the believable proof in the record, the said sixty-two thousand dollars still remains, in legal effect, in his hands. What he did with it we do not know, and, so far as respondent is concerned, it is not necessary for us to know, it being sufficient that he admits that the said sum came into his hands and he has made no believable explanation of what, if anything, he did with it. The legal effect, and the actual effect so far as this record discloses, upon the victim of the payment, is to make out against the respondent the charge of blackmail; and in consequence it must be the judgment of the court that the respondent shall be unconditionally disbarred, and it will be so ordered.

Judgment of disbarment.