EX PARTE MARSHALL.

(In Banc.   April 17, 1933.)

[147 So. 791.   No. 30529.]

See, also, 160 Miss. 874, 134 So. 67.

**J. H. Price,** of Magnolia, and **W. W. Venable,** of Clarkdale, for appellant.

James **A. Leathers**, of Gulfport, **Chas. F. Engle**, of Natchez, **Earle Brewer**, of Jackson, **J. L. Taylor** and **S. C. Mize**, both of Gulfport, **W. L. Guice**, of Biloxi, **Bidwell Adam**, of Pass Christian, and **B. E. Eaton**, of Gulfport, for appellee.

530

Argued orally by **W. W. Venable & J. H. Price,** for appellant, and by **J. A. Leathers, Earle Brewer, J. L. Taylor** and **Charles Engle,** for appellee.

**Ethridge, J.,** delivered the opinion of the court.

Carl Marshall, who was disbarred as an attorney in the courts of this state, filed a petition in the chancery

court of Hancock county, Mississippi, praying for reinstatement, and averring that he has been continuously a resident of the city of Bay St. Louis, in Hancock county, Mississippi, for more than thirty years; that on the 30th day of November, 1931, he was a practicing attorney in the courts of Mississippi, but on said date was disbarred by order of the Supreme Court of Mississippi. In re Marshall, 162 Miss. 364, 138 So. 298. He alleged that, since the date of his disbarment, he has not practiced, or attempted to practice, the profession of law in the courts of Mississippi, and that, at all times, and especially since the date of his disbarment, the petitioner's moral character has been above reproach, and he filed with his petition. the affidavits of numerous credible persons acquainted with his character and reputation, marking same "Exhibit A," and asking that they be considered in connection with his petition.

It was further alleged that said petitioner has been sufficiently punished for anything he may have done in connection with said matter for which he was disbarred, and that his reinstatement will not be prejudicial to the interest of the courts, the bar, and the public, that, up to the time of his disbarment, the petitioner's sole means of support for himself, his wife, and three small children was the practice of law, and that since that date he has been unable to obtain any other employment, or source of support for his family, and that he is now without means.

It is further alleged that the petition for his reinstatement is filed and presented under House Bill 281, chapter 121, Laws of 1932, of the state of Mississippi; that, under said act, petitioner would introduce oral testimony of credible witnesses; that the presentment of this petition under said statute does not involve or bring into question the justice of the original decision of disbarment; that the petitioner bows to the judgment of said court, and assures the court, the bar, and the public,

that, if reinstated, petitioner will not create cause to regret his reinstatement, and avers that he has done all things necessary and has completely rehabilitated himself in all respects.

The petition was verified by the affidavit of said petitioner, who, upon oath, stated that all matters in the petition set forth were true and correct as therein averred. This petition was signed by seventy out of seventy-two attorneys then residing in the coast counties where the petitioner resides, and was accompanied by the affidavits of numerous lawyers, public officers, Protestant ministers, Catholic priests, and leading citizens of that section, and many in other parts of the state, which affidavits constitute a very voluminous record. There were approximately two thousand five hundred affidavits filed with the petition in the chancery court, which were in three or four different forms, but their general purport is that these affiants had known Marshall intimately, and that he had, prior to his disbarment, a splendid reputation as a lawyer and as a man that his integrity and ability were good, and that since his disbarment he had lived a moral and upright life, and that, in the opinion of the affiants, he was rehabilitated and worthy of being restored to practice law. Many of these affidavits set forth business connections in various capacities in which the parties had known Marshall, and the opportunities that they had for judging his fitness to be readmitted into the practice of law.

We assume that the purpose of filing this large number of affidavits, ex parte, to accompany the petition, was to satisfy the State Bar as well as the general public that Marshall's restoration to practice would not only not be harmful to the administration of justice, but would meet with the approval of that part of the bar who lived in proximity to petitioner.

The Board of Commissioners of the State Bar, however, in the exercise of their judgment and discretion,

saw proper to contest Marshall's readmission to practice law, and notice was given of the time and place of hearing before the chancellor. A large number of witnesses were introduced on behalf of the petitioner. The testimony of these witnesses conformed, in general, to the affidavits above referred to, and, on cross-examination they gave reasons somewhat varying for their belief. Most of them assumed that his disbarment by the Supreme Court was proper upon the record before the court, but that, since his disbarment, they averred that Marshall had so lived and conducted himself as to lead them to believe it would be safe to the public interest and the administration of justice for him to be readmitted to practice law, and that they would be willing to intrust him, if restored to practice, with the most important affairs of life as an attorney, having full faith and confidence in his uprightness and integrity.

Marshall himself testified in his own behalf, and stated that he had lived in Bay St. Louis, Hancock county, since 1906, and that on the 30th day of November, 1931, he was disbarred, and that, at the time he was testifying, he had no business; that, up to that time, November, 1931, he had maintained his law office in Gulfport, but retained his residence in Bay St. Louis; that his law office had been closed since his disbarment; that, after he was disbarred, he had some outstanding uncollected fees which he had collected, but that he had no income and no investments which would yield revenue sufficient to support himself and family, and that, at the time he was testifying he was bankrupt, having only twenty-five dollars in cash which he had borrowed; that his brother had furnished him some money prior to the date of his testimony, but he only had said amount at that time; that, since his disbarment, he had not held himself out or attempted to practice law. He further testified that he had a nervous breakdown due to mental strain and the worry and humiliation caused by his disbarment,

having spent slightly in excess of seven weeks in a hospital; that he treated the original order of disbarment as immediately operative and not affected by the suggestion of error, and considered that it would not be deferential to the court of last resort for him to practice in the nisi prius courts pending the termination of the suggestion of error. He further testified that since his disbarment his habits and character had been as nearly perfect as he could make them; that he was particularly careful to avoid every appearance of wrong; that he had no profession or business open to him except the profession of law, and has sought, in every way, to demonstrate his fitness to re-enter the practice of law, with an attitude of resigned fortitude towards it, and bowing to the decision of the court; that he was profoundly regretful that he had any connection with the matter for which he was disbarred; and that, if permitted to re-enter the practice of law, he would be unusually careful to avoid anything of that sort. He further testified that all of his life he had regarded the public welfare as of prime importance, and never in any way, criticized the opinion of the court, even in talking to a client who was, for the moment, disappointed in a decision; that he had tried to instill in clients a patriotic regard for the institutions of government, and that he made no exception when the decision was against him personally; that, in his opinion, a man who had so little regard for courts as to criticize merely because a decision was against his interests, was unfit to practice law; that he had never done that, and that, although he had heard other people do so, and while not criticizing them, he had condemned it in his own mind; that he had suffered indescribably as a result of his disbarment, and would "solemnly assure the court and these witnesses who have rendered such gratifying testimony for me, that they will never have cause to regret my reinstatement;" that he is forty-nine years of age, having a wife and three

children, aged twelve, nine, and two and one-half years; that he had not been admitted to practice law in any other state than Mississippi. He set forth in his testimony various clubs, etc., of which he had been a member, and the offices he had held. He further testified that, when he was elected to the state senate, he resigned his connection with all public service corporations, and returned his annual pass as attorney for a leading railroad system, as he thought that a man should not be a member of the Legislature and represent a public service corporation, and that he never rode on a pass during the whole time he was in the Legislature.

On cross-examination, Marshall was asked whether he was guilty or not of the things charged in his disbarment proceedings. This question was objected to by counsel for Marshall, which objection was sustained by the court. He was then asked if he was, at this time, willing to make full disclosure as to the sixty-two thousand dollars admitted by him to have been received from Craft; as to its disposition; what he received; what were his instructions relative to it; and the names of those to whom he paid it; and the directions, if any, given him by any one relative to its disposition and the names of the parties giving such directions.

Counsel for Marshall objected to this, and the court stated that the witness could answer the question with or without an explanation, and that the court was taking this course for the reason that the question involved a serious question of law; counsel for petitioner taking the position that it is not required and is not necessary to go into this matter as a condition to be reinstated; counsel representing the State Bar taking the opposite position. The court said that it "was not requiring the witness to answer that question, but leaves him free as an intelligent witness, to make such responses to the question as he may elect to make." To this Marshall answered: " I was not disbarred by the

Supreme Court of Mississippi for false swearing or perjury. That is a mistake that has gone through the questioning of counsel for the Bar Association, for the simple reason that I was not charged with perjury in the proceedings. I was disbarred by the Supreme Court for a technical or constructive blackmail, or extortion, in that the Supreme Court rejected as highly improbable, my testimony and that of my corroborating and supporting witnesses as to the explanation of the receipt and the disposition of the money. My regard for the propriety is too great for me to do other than bow to the decision of the court, whatever it is, or was, or however disastrously it affects me and those dependent upon me, and my friends.'' He further stated that the press of the country for two years had bombarded and assailed the credit and credibility of any and all persons, including himself, who might later take the witness stand and testify that the money was paid over to any other than one man; that one man, he averred, was acquitted by the Supreme Court and was practicing law, and that he would never attempt to enter the door by attacking the Supreme Court; that, if he should repudiate the testimony in a way that would be pleasing to those of opposite thought, it would be an embarrassment to the court and injure a man whose status had been established as a matter of adjudication, and would be an act of unspeakable treachery to his corroborating witnesses; that he had not a copper cent of the sixty-two thousand dollars; and that, as to the five thousand dollars fee, he regarded that as a legitimate fee at the time of taking it, and thought he was entitled to it. His full statement is too long for reproduction in this opinion, but he stated that he was unwilling to again go into the disbarment proceedings.

There were many witnesses introduced and cross-examined, such a vast army that counsel for the State Bar appealed to the court to limit the production of wit-

nesses, requesting that types be selected, and thereupon it was agreed that this be done, and witnesses were introduced to testify as to Carl Marshall's character, and they testified that his character for integrity and professional ability was good; that they had observed his character since the date of his disbarment, and that it had been above reproach; that, being acquainted with his general reputation and thinking it good, if the said Carl Marshall should be reinstated as a practicing attorney, they would intrust to him legal matters of the greatest moment; that, in their opinion, he has been sufficiently punished for whatever error he may have committed, and his reinstatement would not be, in any sense, injurious to the courts, the bar, or the public generally; and that the testimony of said witnesses on cross-examination would be substantially the same as that rendered by previous witnesses of their respective classes, and that all of the testimony should be subject to the objections made to the testimony of previous witnesses. The vast number of witnesses under the agreement, as set forth in the record, is too numerous to quote.

After hearing the testimony, the chancellor, after full deliberation, decided to reinstate Marshall to practice law, but postponed the date of his reinstatement until October 1, 1932.

The Harrison County Bar Association passed a resolution reciting the decision of the chancellor, and stating that they had the utmost confidence in the moral character, integrity, and general moral qualifications of said Carl Marshall to practice law in the courts of Mississippi.

The passing of this resolution, as we understand it, was for the purpose of informing the State Bar Commission that the Harrison County Bar Association approved the decree of the chancellor, and, while this resolution is set out in the record, we do not understand that it was designed to influence this court in its decision by the fact that the Harrison County Bar Associa-

tion was passing on Marshall's fitness to be reinstated as a practicing lawyer. The resolution does, however, bespeak the conviction of the members of that association, as to the soundness of the chancellor's decision on the facts produced in the evidence before him.

The State Bar Commission, however, deemed it to be for the best interest of the bar of the state, and acting within its rights under the law, saw proper to prosecute this appeal. We have no criticism to make of their act in so doing. It is a matter of wide public interest, and the commission felt that, whatever might be their views of the matter, the record ought to be reviewed by the Supreme Court which had passed the order of disbarment.

The brief for Carl Marshall was signed by sixty-seven attorneys, that is to say, all but two of the attorneys now practicing in the coast counties, and by long and intimate association they are in the best position to know him. Those attorneys, as shown by the testimony, received no fee for their services, and some of them had not even been reimbursed for expenses paid by them in the procuring of testimony and affidavits. After a full argument in the presentation of their case, the attorneys concluded their brief as follows: "We, the attorneys for the appellee here, and in the court below, solemnly and deliberately assume this role. We have confidence in our judgment of men; we know that we are loyal to the ideals of our profession. We have better knowledge of the appellee's character than have others; we and our own people will be affected directly and personally by his future status. With these considerations before us, and conscious of our responsibility, we solemnly vouch for his present moral character and his future conduct.''

Among the attorneys signing this brief are most of the leading lawyers of that section, men noted for integrity, character, and learning. We take it that they were

acting in the sense of the high duty lawyers owe to the courts to maintain the respect due courts of justice and judicial officers; to employ, for the purpose of maintaining the causes confided to them, such means as are consistent with truth, and never seek to mislead by any artifice or false statement of law or fact.

The law recognizes the fact that men are, and may be, rehabilitated when they have yielded to temptation, when they have repented. Right living and good conduct may entitle a disbarred attorney to be reinstated to the high honors of his profession. Ex parte Redmond, 120 Miss. 536, 82 So. 513; 2 Thornton on Attorneys, 902; 6 C. J. 615, sec. 97; Re Hahn, 56 Cal. App. 702, 206 Pac. 473; In re Davies, 93 Pa. 116, 39 Am. Rep. 729, and note; 95 Am. Dec. 344, note; 2 Am. St. Rep. 861, note; 48 A. L. R. 1236, note; Ann. Cas. 1912A, p. 813, note.

In Ex parte Redmond, 120 Miss. 536, 82 So. 513, supra, the application for reinstatement after being disbarred was made when there was no specific authority to reinstate, and the provisions of section 223, Code of 1906, among other things, provide that, if an attorney should be guilty of the offenses named therein, he should be stricken from the roll and disbarred and his license revoked by any court in which he practiced, and that such person should never afterward be permitted to act as an an attorney or counselor in any court in this state. From the opinion rendered in this case, the writer of this opinion dissented under the belief that the provisions of the statute prohibited Redmond's reinstatement, but the majority of the court construed the statute to hold that it did not have such effect, and that the power to reinstate a disbarred attorney existed. Of course, that construction was the law of the state, and every judge is bound by the decision regardless of his personal views.

Since that time the Legislature has recognized the soundness of the principle, and has provided definitely for the reinstatement of disbarred attorneys. Laws of

1932, c. 121. Of course the requirements for reinstatement are the same as for original admission to the bar, except that the court may require a greater degree of proof than in an original admission. The conduct required as to the character of an attorney is such as to evidence his fitness to discharge the powers and duties of an attorney, and a failure to possess these qualifications, or should the evidence show that he no longer possesses such a character, authorizes a disbarment. Likewise after being disbarred, he may rehabilitate himself and re-establish his moral character. Re Redmond, 156 Miss. 439, 125 So. 833. We quote from a case note in 48 A. L. R., pages 1237-1239, the following which correctly summarizes the holding of those cases: In the case of In re Hahn, 56 Cal. App. 702, 206 P. 473, 474, an attorney was reinstated after being disbarred while a young man, where his petition showed that he had served in France during the World War and received an honorable discharge; his petition being supported by testimonials from lawyers and business men. In weighing evidence submitted in the testimonials, the court there said: "The fact that three lawyers of long experience at the bar and of unquestioned standing have appeared as counsel and personally urged that favorable action be taken upon the application is entitled to be given weight in resolving the question. Their appearance in this behalf carries with it the guaranty that they act not alone for the best interest of the applicant, but also in the interest of the bar at large."

In re Boone (C. C.), 90 F. 793, a disbarred attorney was reinstated in the federal circuit court of California, in which he had practiced for twenty years before his disbarment on a showing in his petition that he accepted the rules laid down in the opinion disbarring him, and promised to observe all the duties, and be faithful as an attorney, which petition was supported by a testimonial from two hundred members of the local bar.

In re Troy (R. I.), 118 A. 869, an attorney suspended for two years was reinstated on a showing that he had complied with the court's orders.

In re Simpson, 11 N. D. 526, 93 N. W. 918, an attorney was reinstated after his petition was investigated by a committee of the bar association, which recommended that he be reinstated, being also supported by testimonials from a number of bankers, lawyers, and business men.

It was held in re La Motte, 77 Cal. 733, 247 P. 524, 525, that a petitioner for reinstatement had sustained the burden of proving both moral and mental qualifications, and he was reinstated three years after his disbarment. In this case a committee of the bar association investigated the petitioner's "activities and conduct," and recommended to the court that he be reinstated.

In People ex rel., Colorado Bar Ass'n. v. Essington, 32 Colo. 168, 74 P. 394, a disbarred attorney was reinstated where it appeared that he had served four years during the Civil War in the Union Army, that he had resided fifteen years in the state, and that his conduct was good except for the incident charged in the information.

A petition was granted In re Adriaans, 33 App. D. C. 203, reinstating the petitioner, where the petition alleged he was a member of the Supreme Court of the District, in good standing, and no charge of any kind was pending against him, and the bar association did not resist his application.

In re Weed, 30 Mont. 456, 77 P. 50, an attorney suspended for two years was reinstated at the expiration of that time when he presented a petition supported by practically the entire bar.

In re Treadwell, 114 Cal. 24, 45 P. 993, a disbarred attorney was reinstated where two members of the bar testified that, during the nine years which have elapsed since said Treadwell entered their employment, as afore-

said, petitioners have reposed in him the most implicit confidence, and have given to him the management of matters of great importance, requiring the utmost care, secrecy, and good faith, and have intrusted to him large sums of money and property belonging to themselves and others; that their confidence in him has never been betrayed, and that they have always found him to be careful and trustworthy in the highest degree; that during all of said time, petitioners have had frequent social intercourse with said Treadwell and members of his family, and can and do truly certify to his good character as a husband and parent, and as a moral and upright citizen of this community; that the conduct of said Treadwell since the 1st day of January, 1887, has ever been such as to inspire confidence in his character, honor, and integrity, and to warrant this application to the court in his behalf; and it is their firm belief and opinion that he can be safely admitted to practice again, and intrusted with the affairs of clients.

And in re Harris, 88 N. J. Law, 18, 95 A. 761, where the court observed that partial restitution might be sufficient under the circumstances to justify the reinstatement of a disbarred attorney; and that its aim was to search the heart of the petitioner to determine his moral standard as shown by his conduct, the petition being supported by recommendations from the local bar association, it was held that the heretofore insuperable bar to the application had been removed.

In re Newell, 208 App. Div. 496, 203 N. Y. S. 677, an attorney was reinstated where his petition showed that he had obeyed the court's order and made an honest living; the petition being supported by a county bar association, and no one being opposed to his reinstatement.

A petitioner was reinstate in re Newton, 27 Mont. 184, 70 P. 510, 982, where it appeared he had become sober, had lived an upright, honorable life, and that, in

the estimation of his fellow citizens in the community in which he resided, and also of reputable member of the bar, he was a fit person to practice law.

And in re Morton, 75 Cal. App. 497, 243 P. 32, after seven years of clean living, a disbarred attorney was reinstated, it appearing that he enjoyed the confidence of the bench and bar; his petition being supported by letters from lawyers and judges, and the bar association, having notice, making no objection to his reinstatement.

The evidence in this case is overwhelming and undisputed that Carl Marshall, since his disbarment, has lived an exemplary life; that he had rehabiliated himself, and is now worthy of being reinstated. The evidence also shows that prior to his disbarment, excepting only the matter for which he was disbarred, his integrity and fidelity as a lawyer had never been in question, and he enjoyed the esteem of the citizens in his community. Of course, in reinstating a person who has been disbarred, in determining the question whether he possesses a good character, it is competent to look to his life prior to his disbarment; but the main question is whether, at the time he seeks reinstatement, he possesses the necessary character to guarantee the faithful discharge of his duties as a lawyer and an assistant in the administration of justice. Much depends upon the person's education and environment, and upon the character of the person disbarred previous to the commission of the offense. This will abundantly appear from the cases and case notes cited.

The men who testified to Marshall's fitness to be restored to practice law are men of the very highest standing in that section of the country; many of them being public officers, professional men, and lawyers and leaders in the social and business life. We feel sure they were sincere in their estimate of Marshall's character, and that they would not have testified as they did except that they were profoundly convinced that he was of

such character as would make him a safe person to be reinstated to the high honors of the legal profession.

What we have said does not, in any manner, impair our confidence in the soundess of the Supreme Court decision disbarring Marshall. Although h'is previous record is shown to, be good, the offense for which he was disbarred was serious. The discipline of his disbarment was severe, and we believe that repentance and rehabilitation has been profound, thorough, sincere, and permanent. We did not disbar Marshall on the theory, as suggested in the brief for the appellee, that the court could not, under the law, inflict any milder penalty than disbarment. The offense was so serious and so calculated to result in public demoralization, if treated lightly, that we thought disbarment was the appropriate discipline to apply. We, of course, had in mind the law that an attorney could rehabilitate himself after being disbarred and be readmitted into the profession, but we thought that a severe penalty was better calculated to bring about a repentance and rehabilitation than if a' milder penalty should be inflicted, and that he would not be reinstated unless the facts and circumstances, when the application was made, warranted the court in reinstating him. If he had been merely suspended, at the end of the suspension period, he could have resumed practice without sufficient rehabilitation and repentance.

As shown above, the testimony overwhelmingly shows that he had rehabiliated himself, and, in the opinion of the members of the bar of his section, and other leading citizens of this state, he is fully worthy of being reinstated.

In determining character, the opinion of the public, when settled and deliberate, is the highest evidence thereof. The usual method of proving character is by proving the general reputation of the party in the community in which he lives as to the traits of character involved in the inquiry. However, in cases where good

character is a qualification for employment, especially such as is affected with the public use or the public interest, the estimate of witnesses intimately acquainted with the person subject to the inquiry is receivable, for by constant and intimate association a person gains a better knowledge of another than is gained by only the general reputation. But, whether limited to the evidence of the reputation, or whether taken together, the proof in this case shows as fully as it is possible to show a repentant and rehabilitated person in the appellee, Carl Marshall.

It is urged in the brief for the appellant, however, that the evidence of repentance is insufficient, because Marshall refused to go into the matter involved in the disbarment trial. In other words, Marshall was placed in the dilemma, by the questions asked, of either challenging the soundness of the disbarment decision, or admitting that he had willfully and corruptly committed perjury.

We do not think this test should be applied. Marshall testified, and so did his witnesses, that he had accepted the decision of the court as a final judgment; that he did not challenge, in any way, the decision of the court; that he had confidence and respect for the court as an institution, and he never criticised it, deeming it inconsistent with the high duty of an attorney, although such decision affected him personally very severely.

It has never been the policy of the law in this state, nor in the country from which we inherited our laws and institutions, to require a person to testify, in a civil or criminal case, so as to make out a criminal offense against himself. If Marshall had testified that his former evidence was false and corruptly given, or admitted that it was false with knowledge of the facts, he would have opened the doors of the penitentiary instead of the doors of reinstatement to practice law. Section 26 of the Constitution provides that "In all

criminal prosecutions the accused . . . shall not be compelled to give evidence against himself.''

This is crystallized in the common law, as are the principles that a man shall not be compelled to furnish evidence which would convict him, and especially in a crime punishable with infamy; that is, with a term in the penitentiary.

The judgment of this court in the disbarment proceedings is final and conclusive. It needs no confirmation to give it truth and verity. Nothing that Marshall could say would strengthen the force of that judgment, nor impair its legal efficacy. It might be an explanation to people in doubt, and it might strengthen the faith of those who believe the judgment was right, but the legality of the judgment stands as insuperably true. We do not think it was essential to Marshall's rehabilitation and repentance that he make an admission that he committed perjury, or was guilty of deliberate blackmail in a former hearing. Courts, in deciding matters, consider the probability of the evidence and the character of the witnesses; and the credence given to the evidence by the triers of the facts turns, in the last analysis, upon the credibility and probability of the truth or falsity of the particular evidence.

Infallibility is not given to human beings or human institutions, but, when probability reaches that high degree of certainty that it excludes reasonable doubt, courts must act upon it, even where life itself is at stake.

If we have read the briefs for the commissioners of the State Bar with a correct understanding of the central contention therein, that contention is this, that, by the judgment of this court in the former proceeding, the court rejected Marshall's testimony as to the disposition made by him of the sixty-two thousand dollars, that in consequence this court adjudged him guilty of perjury, and that a perjurer should not be admitted or readmitted to the practice of law. Appellants did not so

bluntly state their position, but, stripping the excellent briefs filed by the appellants of their adornments, that is their contention. If this be a sound contention, then no attorney who has testified in a disbarment proceeding against him and whose testimony has been rejected by the court can ever be reinstated; but the books are filled with cases where the disbarred attorney has been reinstated although his testimony in the original disbarment case was rejected by the court. Many of the cases that we have already cited show that the law in the respect mentioned is not as contended for by appellants herein, and there are numerous other cases to the same effect contained in the cases and case notes referred to in this opinion.

What the courts pass upon in cases for reinstatement, and what we pass upon in this case, is the question whether the applicant, Marshall, has been sufficiently rehabilitated in conduct and character to be safely readmitted to practice law, and this question we must decide upon the record, as it exists before us at the time of the decision upon that question, and we have stated the overwhelming character of the evidence in Marshall's behalf on that issue.

The Bar Act, section 27, chapter 121, Laws of 1932, makes the circuit judge or chancellor of the county in which the party to be disbarred resides the exclusive custodian of original jurisdiction, to determine in the first instance, whether or not a party should be readmitted to practice after disbarment, and section 26 provides as follows:

"When any member of the Bar who has heretofore been, or who may hereafter be suspended or disbarred, and after a period of probation, suspension or disbarment, he wishes to be reinstated, he may present his petition for reinstatement to the Board of Commissioners and when said petition so presented is granted by said board through its written endorsement on said

petition then said disbarred or suspended member is authorized to file his petition in either the chancery or circuit court; or said suspended or disbarred member shall have the right to file a separate and independent petition seeking reinstatement before the chancellor or the circuit judge of the county of the residence of said suspended or disbarred member, and when petition in either case has been filed, a written notice shall be served the same as summonses are served, upon the secretary of the Mississippi State Bar, at least ten days before the hearing, notifying him that said proceedings have been instituted, whereupon the said secretary shall notify the Board of Commissioners, who shall attend the hearing or have a representative attend the hearing, for the purpose of representing the State Bar in such proceedings. If upon the hearing of said petition for reinstatement it is refused, the petitioner shall have the right of appeal to the Supreme Court of the state. If an order of reinstatement is entered, the State Bar shall have the right if it desires, likewise to appeal to the Supreme Court without bond, which said appeal shall be taken within sixty days from the date of such decree, and during the period of such appeal, the disbarred attorney shall be prohibited from engaging in the practice of law in the courts of the state. If the Supreme Court, on appeal by petitioner, refuses to affirm the reinstatement the disbarment member shall not present another petition for reinstatement for a period of twelve months from the date of the decision by the Supreme Court refusing to affirm.

"Provided, that in all disbarment and/or reinstatement proceedings in the chancery or circuit court, a record shall be made of all testimony, evidence and other proofs taken in such proceedings, and upon appeals in such proceedings from the chancery and/or circuit court to the Supreme Court, the record shall be made up and filed with the Supreme Court as in other cases. The

Supreme Court shall consider the evidence in the case, as disclosed by the record, and such other evidence as it may deem necessary for the administration of justice, and shall decide all questions of law and fact and render final judgment as to the disbarment, suspension and/or reinstatement, as the case may be. The rule that the Supreme Court will not reverse the judgment of the lower court on a question of fact unless it affirmatively appears upon the face of the record that the cause was decided contrary to the evidence shall not apply in cases arising under this act, but the Supreme Court shall be the final judge of the facts, and the judgment to be rendered thereon."

Under this act, the appeal is on the record, and the statute uses the term "affirm," clearly indicating that the review is on the record with a right in the Supreme Court to require additional evidence should it deem the same necessary to a just decision. In all cases provided by statute where the trial is to be de novo, the statute so provides in express terms. It is true that on appeal the court can review the findings of fact by the chancellor or circuit judge, and is not bound by the findings on conflicting evidence, but this does not prevent the presumption of rightfulness of the decisions from being indulged until the contrary appears from a consideration of the whole record, and it requires a majority of the judges of the Supreme Court to reverse a decision by the trial court. The Supreme Court may substitute its judgment for that of the trial court, but it requires a majority of the court to do this, regardless of whether the trial court granted or refused the application. This conclusion is strengthened by the provisions of section 3378, Code of 1930, in existence prior to the enactment of chapter 121, Laws 1932. The provisions of that section operate up to the extent of conflict with the new law. It is therefore manifest that the trial here is not de novo.

It is competent for the Legislature to confer exclusive

jurisdiction of disbarring or reinstating attorneys. They are admitted as officers or assistants in the administration of justice. The Legislature has the power to make many regulations and to enlarge or restrict proceedings in courts. Const. 1890, sections 33 and 103; State ex rel. Jones v. Laughlin, 73 Mo. 443; Winkelman v. People, 50 Ill. 449; Mattler v. Schaffner, 53 Ind. 245; Morrison v. Snow, 26 Utah, 247, 72 P. 924; People v. Goodrich, 79 Ill. 148; In re Darrow, 175 Ind. 44, 92 N. E. 369; and in re Ebbs, 150 N. C. 44, 63 S. E. 190, 19 L. R. A. (N. S.) 892, 17 Ann. Cas. 592

The object of disbarment is not punishment, that being only an incident; but its object is to discipline the attorney and protect the public, and the requirements for reinstatement is rehabilitation, or a regaining of character evidencing worthiness to be reinstated.

A court, in such a proceeding, is not administering punishment; it is passing upon character. We do not believe it requires a long period to discipline and effect a rehabilitation of character. A firm resolve to live a correct life evidenced by outward manifestations sufficient to convince a reasonable mind clearly that the person has reformed is only required. In restoring a disbarred attorney, the principal question is whether that particular attorney would be safe to assist in administering justice, if readmitted; and the effect of his readmission upon the conduct of others, while important, is a subsidiary consideration. A man who has redeemed himself and become worthy to be readmitted should not be kept out of the profession to which, perhaps, he has devoted much of his life and means, because others might, possibly, be led thereby to do evil.

We hold a power of discipline over an attorney who is false to his duties. Reinstatement of an attorney who has been disciplined is, by no means, a surrender of this power. It may be asserted whenever it is required.

We believe the applicant here has realized that he is under the watchful eyes of both friends and foes; that he will have the counsel of his friends in the community in which he lives, and especially of those who have pledged themselves to establish his readmission.

The judgment of the court below, therefore, will be affirmed.

Affirmed.

**Smith, C. J.,** delivered a dissenting opinion.

The petitioner was disbarred from the practice of law by this court in a proceeding therefor by the State Bar Association, in which its judgment became final when a suggestion of error thereto was overruled on March 7, 1932. In re Marshall, 162 Miss. 364, 138 So. 298. On June 4th, three months thereafter, he filed a petition for reinstatement in the court below, under section 26, chapter 121, Laws of 1932, the constitutional validity of which is not challenged by the parties hereto, and I will express no opinion thereon. The prayer of the petition was granted, and the State Bar Association has appealed from the order therefor.

Before examining the record, it will be well to again set forth the nature of the office of an attorney at law, and his relation to the court, the bar, and the public.

Governments in all civilized countries are organized, among other things, to "establish justice, insure domestic tranquility," and "promote the general welfare." To that end all of the state's judicial power is vested in its courts of justice, whose duty it is to decide all justiciable controversies arising under the state's Constitution and laws. A court of justice consists, not of the judge alone, but also of its administrative machinery, a fundamental and essential portion of which is attorneys at law. While not strictly a public officer within the constitutional and statutory meaning, an attorney at law

is an officer of the court in which he practices, without whose assistance the English and American courts cannot properly function. "By approved practice, and ex necessitate, an attorney at law is clothed in some measure with the court's power. For instance, his engagement in a case gives him a right to command the court's processes of summons and subpoena, and the court's officers are at his call to execute his will in behalf of his client for many purposes. His retainer gives him the ear of the court, and also affords him the court's protection against a refractory client. He is the only proper vehicle of communication between the court and his client, and upon him the court must rely for the performance of many intimate and responsible duties." 1 Thornton on Attorneys at Law, section 13.

When the petitioner was disbarred we said: "There could hardly be any serious denial of the assertion that the trained and learned lawyer of dependable moral character is an indispensable assistant in the operation of the intricate machinery of efficient government, especially in the courts, to say nothing of the necessity of his presence in the manifold and almost infinite complexities of commercial and civil life. Gratitude for the past would incline us to make this admission, even if candor and common observation in respect to the present did not compel it. Indeed, the Constitution itself has recognized the fact, and has declared that the recognition shall be permanent, for it has, by apt provision, made the continuance of the superior courts therein established conditional, in effect, upon the continued existence of the legal profession, because in its sections 150 and 154, Const. 1890, it expressly ordains that no person shall be eligible to the office of judge of the Supreme Court, of the circuit court, or of the chancery court, who shall not have been a practicing attorney and citizen of the state for five years. . . . The learned lawyer of trustworthy character is essential not only to the continued existence of

these three superior courts, but is necessary, as well, to the efficient and beneficial performance of the appointed duties of said courts." In re Steen et al., 160 Miss. 874, at page 884, 134 So. 67, at page 69.

The ability of the courts "to establish justice, insure domestic tranquility, and promote the general welfare" depends, in a large measure, on public confidence in their integrity, the instillation and preservation of which rests equally on the judge and the attorney—on bench and bar. That confidence in the integrity of the courts may not be impaired, constitutional and statutory methods have long existed for removing therefrom not only unworthy members of the bench, but also unworthy members of the bar. To the honor of both of these branches of courts of justice, it has seldom been necessary to resort to proceedings for this purpose; and, to the honor of the bar, it can be said that it has generally measured up to its high responsibilities in this regard.

The right to practice law is not a natural or constitutional right, but is a revocable privilege, conferred in this state on persons, "above the age of twenty-one years, of good moral character," having "at least, a high school education or its equivalent," and possessing a prescribed degree of legal learning. Chapter 82 of the Code of 1930. An attorney's good moral character must not only appear when he is admitted to the bar, but must continue thereafter, in default of which, his license to practice may be revoked. Section 3703, Code of 1930; section 26, c. 121, Laws of 1932.

The statute does not set forth the grounds on which a disbarred attorney may be reinstated, leaving that question to the law governing it theretofore in effect, under which the question is, Is the petitioner of good moral character, and a fit and proper person to assist the court in the administration of justice? Or, to state it differently, Would his reinstatement be compatible with the proper respect of the court for itself, the dignity of the

profession, and the safety of the public? There are four parties before the court in such a proceeding—the petitioner, the court itself, the bar, and the public.

The petition, among other things, alleges that: "At all times, and especially since the date of his said disbarment, your petitioner's moral character and consequent fitness to practice law, has been above reproach; and in substantiation of this averment, your petitioner does file and present herewith the ex parte affidavits of numerous credible persons acquainted with his character and reputation; said affidavits being hereunto attached, hereby referred to and identified as Exhibit 'A' to this petition, and asked to be taken and considered as a part hereof. Your petitioner has been more than sufficiently punished for anything of error that he may have done in connection with the said matter for which he was disbarred; and the reinstatement of your petitioner to the right to practice the profession of law in the courts of Mississippi would not be prejudicial to the interests of the courts, the bar, or the public."

The affidavits referred to as Exhibit A to the petition are said to exceed twenty-five hundred in number and come from all parts of the state. Most of them are in identical, and the others in similar, language. They are to the same effect as the oral testimony hereinafter mentioned. They were introduced in evidence at the trial over the objection of counsel for the State Bar Association; but the chancellor, in a written opinion, said he had left them out of view in deciding the case. This cured the error, for such it was, in their admission in evidence.

The testimony in support of the petition is that of the petitioner himself, and of persons who testified in support of his moral character. The bar association offered no evidence, but rested its opposition to the petitioner's reinstatement on the evidence introduced by him.

After the petitioner had introduced forty-eight character witnesses, counsel for the bar association agreed that one hundred and fifty other persons, present for that purpose, would give substantially the same evidence as to the petitioner's moral character as that given by the witnesses who had then been introduced; and th_ evidence of these persons was not then offered.

This character testimony is, in substance, that the petitioner, prior to his disbarment, was of good moral character; his reputation did not suffer from his disbarment; he is now of good moral character; the administration of justice will not suffer by his reinstatement; and the public desires that he be reinstated. The brief of counsel for the petitioner is grounded on these five propositions, and, in addition, that the petitioner has been sufficiently punished for the commission of the act for which he was disbarred, and the members of the bar with whom he practiced law desire his reinstatement.

Punishment is no part of the purpose sought to be accomplished by the disbarment of an attorney; the purpose sought to be accomplished thereby being simply the eliminating from the practice of law of a person unfit therefor. Punishment for wrongdoing is inflicted by the state, under its criminal laws, imposed by its courts of criminal jurisdiction, to which an attorney is subject to the same extent as, but no further than, all other persons. It is true that the statute recognizes the disciplining of attorneys by methods short of disbarment, on the theory that they will thereby be induced to thereafter observe the duties of their office. But be it said to the credit of the bar, that with few exceptions, its members are faithful to the trust imposed in them, not because of any fear or punishment for violations thereof, but for "truth's sake and conscience." One who abstains from evil merely because of the fear of punishment cannot, in the very nature of things, be morally good.

The evidence establishes that prior to his disbarment the petitioner enjoyed, as the vast majority of men do, a good reputation. Reputation is not of itself character, but is accepted as evidence thereof, on the theory that the two generally coincide. This is not always the case, for "a goodly apple" may be "rotten at the heart."

It is difficult to conceive of the disbarment of an attorney not affecting his reputation, and, in justice to the witnesses who testified that the appellant's disbarment did not affect his reputation, it is necessary to say that they explained it by saying that the judgment of this court was not accepted as establishing the fact of the petitioner's wrongdoing; various reasons being assigned therefor. I will refrain from commenting on this, but will say that the administration of justice is on a precarious footing when the judgments of the courts are not accepted as establishing the facts on which they are rendered.

The evidence that the petitioner's moral character has been good since his disbarment amounts simply to a declaration by the witnesses that he had not publicly been guilty of wrongdoing since he was disbarred. This I accept as true; but it falls far short of establishing the petitioner's inner self, his actual moral character. It has evidential value, but we do not have to rest our judgment on it alone, for the petitioner himself testified, and gave a perfect picture of his inner moral self.

That the people desire his reinstatement, if such is the fact, must be laid on one side. The doors of the temple of justice should be closed to popular clamor either for or against a person on trial therein; and "we would be unworthy of the high places we hold" if we permitted it to enter there. Owens v. State, 80 Miss. 499, 516, 32 So. 152, 155. As was said by Judge ETHRIDGE, when we assumed jurisdiction of the proceeding to disbar this petitioner, "We should . . . deliberate in a place that 'is imperviously padded against popular

clamor and passion.'" In re Steen et al., 160 Miss. 874, at page 917, 134 So. 67, at page 81. Courts of justice should render such judgments only as are warranted by their conception of the principles of law as applied to the facts of the cases in which their judgments are rendered. Were it otherwise, life, liberty, and property would not be safe with them.

It appeared in the petitioner's disbarment proceeding that he had extorted by blackmail the sum of eighty thousand dollars; he disclosed the disposition he had made of eighteen thousand dollars thereof, but declined to say what he had done with the remaining sixty-two thousand dollars, except by an unbelievable story, which the court rejected, leaving that much of the money unaccounted for, and presumably in his own hands. Any disposition he made of this money could not have removed or lessened his moral guilt in obtaining it; and a disclosure by him of what he did with it would simply have disclosed who his confederates were, if, in fact, there were such.

The petitioner has assumed throughout this proceeding for his reinstatement that he was convicted merely of a technical blackmail, whatever that may be. In refusing to comply with a request of counsel for the State Bar Association to clear up, if he could, the charge against him, for which he was disbarred, he said: "I was disbarred by the Supreme Court for a technical or constructive blackmail, or extortion, in that the Supreme Court rejected, as highly improbable, my testimony and that of my corroborating and supporting witnesses as to the disposition of the money. My regard for the propriety is too great for me to do other than bow to the decision of the court, whatever it is, or was, or however disasterously it affects me and those dependent upon me and my friends. I wish to say this, in justification of those who did not believe the explanation given, that for approximately two years the press of the coun-

try, inspired by certain motivating influences, bombarded and assailed the credit and credibility of any and all persons, including myself, who might later take the witness stand and testify that that money was paid to any one than one man. That one man was acquitted by the Supreme Court, and is now engaged in the practice of law. I would never attempt to enter the door by attacking the Supreme Court. If I should repudiate the testimony in a way that would please those of opposite thought, it would be an embarrassment to the Court— a contempt of the Court, and an injury to a man whose status has been established as a matter of adjudication —res adjudicata—an act of unspeakable treachery to the witnesses who corroborated my testimony, and I have too much love for the law profession; too much genuine and sincere attachment for it and appreciation of the public importance of its standing to the people to ever wish to be a liability to it by being a member of the bar as a confessed blackmailer and perjurer. That, as God gives me the light to see, I shall not do, regardless of consequences, and at the same time never will I prove myself unfit to be a lawyer—whether I am one or not— by taking issue with the Court of my land after a final decision.''

The petitioner was convicted by this court of no technical blackmail, but of blackmail in fact, deliberately planned and executed, as will be disclosed by the reading of its opinion rendered when he was disbarred, In re Marshall, 162 Miss. 364, 138 So. 298, and no new evidence has been introduced that would even faintly indicate that his conviction was not in accord with the actual fact. On the contrary, there is an implied admission in the petitioner's testimony, hereinbefore set out, that his testimony in his disbarment proceeding was false, and he gives four reasons why he should continue to stand by, and not repudiate, it: (1) It would be an embarrassment to the court, a contempt of the court;

(2) an injury to a man whose status has been established as a matter of adjudication; (3) an act of unspeakable treachery to the witnesses who corroborated his testimony in his disbarment proceeding; and (4) he does not wish to become a liability to the legal profession by becoming a confessed blackmailer and perjurer.

None of these reasons have any foundation in law or morals. For him to now admit that his former testimony was not true, and therefore the court's judgment was correct, could hardly cause this court any embarrassment. For him to confess having committed blackmail and perjury may be humiliating; but to confess wrongdoing—the commission of a crime—may at times be not only necessary, but good. To refuse to confess the commission of a crime, not because it was not committed, but only because its confession would disclose that other persons participated therein, is bad. No man is justified in law, and seldom, if ever, in morals, in shielding criminals from paying the penalty of their crimes. He may not be called on in all cases to voluntarily bring them to the bar of justice; but to affirmatively shield and protect them is a different matter.

The investigation into the petitioner's present moral character begins with two established facts: (1) He committed blackmail and perjury; and (2) his moral character when he committed those crimes was bad. The nature and quality of blackmail and perjury are such that the will to commit them cannot be formed by a mind that is morally good, and their commission demonstrates the moral depravity of the person committing them. If the petitioner's character is now good, the change from bad to good was so rapid as to be probably without precedent. It may be that such rapid and radical reformations are possible, but they are not in accord with human nature; for it is as true now as when it was said two thousand years ago by one of the greatest of the Roman lawyers, that "No one of us can suddenly assume a

character, or instantly change his mode of life, or alter his nature.'' The courts act upon this assumption, for they ''will not ordinarily reinstate an attorney where his petition for reinstatement follows closely upon his disbarment.'' 2 Thornton on Attorneys at Law, section 902. There is, as Thornton says, one remarkable case to the contrary, People v. Essington, 32 Colo. 168, 75 Pac. 394, wherein the court reinstated an attorney by the same order which disbarred him. This case is without a brother, and to follow it generally would bring the courts into disrepute.

In order that character, broken by wrongdoing, may be re-established, it is absolutely necessary for the wrongdoer to repent, with all of its connotations, of the wrong done. This is the verdict of religion, and is inherent in the moral nature of man. 10 Hastings' Ency. of Religion and Ethics, 731. Repentance, to be sincere, involves a realization of one's condition and a definite mental determination to reverse his course and retrace his steps at any risk, an outstanding example of which is that approved by the Master in the parable of the Prodigal Son. It includes confession of wrong done, and restitution therefor, in so far as it is possible so to do. In re Zaccheus, Luke, chapter 19. The petitioner has done none of these. On the contrary, he asserts, in effect, that he has done nothing of which to repent.

The petitioner did express regret for what had occurred. But that regret was in effect, but an assertion that, according to his conception of what he did, he was guilty of no wrong. In reply to this question by his counsel, ''I want to ask you with reference to any regrets for having gone into that matter for which you were disbarred, have you any regret?'' he said: ''Well, regret would be too mild a term, I should think. I am very, very profoundly regretful that I had any connection at all with the matter, that might be open to a construction of evil or the appearance of evil.'' The answer is in full accord

with his contention that he was convicted only of a technical offense.

Repentance, confession, and restitution have long had a fixed and definite place in the law. In equity, restitution must be made when so to do is necessary to purge a complainant or defendant of iniquity. In civil suits for the commission of some torts, repentance, confession, and restitution mitigate damages; and, in prosecutions for crime involving the wrongful taking of property, they mitigate the punishment and under statutes in some states lower the grade of the offense. What the petitioner here asks, in effect, is that the sentence of disbarment pronounced against him be mitigated by being reduced, in effect, to suspension. When an attorney who has been disbarred for wrongfully withholding his client's money applies for reinstatement, the courts require as one condition therefor that he pay to his client the money withheld. 2 Thornton on Attorneys at Law, p. 1337. This court is committed to that doctrine in cases of blackmail; it has applied it in a branch of this particular case. In re Howie (Miss.), 138 So. 324.

Marshall disposed of eighteen thousand dollars of the eighty thousand dollars, extorted by him from the person blackmailed, in this way: One of the elements entering into the extortion of the eighty thousand dollars was the settlement of a lawsuit in which Marshall was acting for Howie's firm, which was counsel therein. He admits retaining five thousand dollars of this money, which he says was his fee for services rendered Howie's firm in effecting the settlement, and paid thirteen thousand dollars to Howie's firm. Howie appropriated a part of the thirteen thousand dollars to himself as his portion of his firm's fee in effecting the settlement. This court held that this eighteen thousand dollars was a part of the money extorted by Marshall—blackmailed by him— from the person who paid it. It acquitted Howie of complicity in the blackmail; but said that after acquiring

knowledge thereof he ought not, and would not be permitted, to retain the money received by him, and did not dismiss the petition for his disbarment until he satisfied the court that he had disposed of it in the manner directed by the court. The rule there applied to Howie seems inescapable here. It may be that the person from whom the petitioner obtained this money is not morally entitled, because of his own conduct, to demand its repayment. But that is beside the mark, for the same question was presented in Howie's Case, but nevertheless the court would not permit him to retain the money.

But it is said that the petitioner cannot make restitution, for the reason that he is not in possession of the money he extorted from the person blackmailed, and has no money of his own with which to make restitution. This may or may not be true. It rests wholly on the petitioner's own testimony, and that of other persons, to the effect that they were in possession of no evidence that the petitioner had this or other money of his own. In equity and good conscience, in justice to himself and his professional brethern, the petitioner should disclose why he has not this money; in other words, what he did with it. Then, and not until then, and not then if he has money of his own sufficient for that purpose, should he be relieved of the duty of making restitution.

It may be said that the petitioner cannot make restitution without thereby confessing the commission of blackmail, and subjecting himself to a prosecution therefor. This may be true, and, if so, he has the right to remain silent, and not voluntarily offer restitution; but every right has its correlative duty and sometimes burden. Until restitution or its equivalent is here made, the duty is cast on us of not readmitting the petitioner to the practice of law, and this burden he, of right, should bear unless and until he makes it appear that he did not profit by the wrongdoing, or that he is unable to make restitution. In re Howie, supra. He should make a full dis-

closure in these two particulars, or bear the burden for not so doing. We must not forget that three cardinal virtues of a lawyer are "truth, simplicity and candor."

We have been continuously reminded that the petitioner is a brilliant and able lawyer, and his counsel say, "If once he has been an ornament (meaning to the Bar) whose value has been destroyed by some single failure, then the court is impelled to the restoration, because the fact that once he had adorned the profession is itself an evidence not alone of ability, but equally of character."

This argument is not without force, for no less a man than Judge SHARSWOOD has said, "Let it be remembered and treasured in the heart of every student, that no man can ever be a truly great lawyer, who is not in every sense of the word, a good man." In this he but followed Lord Coke, who said, "I never saw any man of a loose and lawless life attain to any sound and perfect knowledge of the laws; and, on the other side, I never saw any man of excellent judgment in these laws, but was withal, honest, faithful and virtuous." This is in accord with the general rule, to which, as to most rules, there are, of course, exceptions. Brilliancy and ability do not alone make a lawyer great; counsel may have placed the petitioner on too high a pedestal. Be that as it may, it is our duty to decide the case on the evidence, and try the petitioner by the same rule we would apply to the humblest member of the bar.

It must not be forgotten that the petitioner is not a young attorney just beginning the practice of his profession, who swerved from truth and fairness in a small particular before his moral character had become mature. On the contrary, he is a seasoned lawyer, enjoyed a large and lucrative practice, and has reached that period of life at which moral character has matured, and generally thereafter remains practically the same. When he was disbarred, his moral character was such as to permit him to commit blackmail and perjury; and his own

testimony demonstrates that his inner self has not changed, that his moral character is today what it was then. To reinstate him under such circumstances is calculated to, and may, shake public confidence in the courts and in the integrity of the legal profession, the high ideals of which it is our duty to preserve. In the preamble to the American Law Association's Canons of Ethics it is said that: "In America, where the stability of courts and of all departments of government rests upon the approval of the people, it is peculiarly essential that the system for establishing and dispensing justice be developed to a high point of efficiency and so maintained that the public shall have absolute confidence in the integrity and impartiality of its administration. The future of the republic, to a great extent, depends upon our maintenance of justice pure and unsullied. It cannot be so maintained unless the conduct and the motives of the members of our profession are such as to merit the approval of all just men."

The petition for reinstatement was signed by seventy attorneys, said to include all but two of the members of the bars of Jackson, Hancock, and Harrison counties. Many of them testified for the petitioner at the trial. All of them signed the brief for him in this court, though it appears from the brief that six only of them are his counsel in fact.

After quoting this statement by the Supreme Court of California, In re Hahn, 56 Cal. App. 702, 206 P. 473, 474, in a reinstatement proceeding, with reference to counsel for the petitioner, "Their appearance in this behalf carriers with it the guaranty that they act not alone for the best interest of the applicant, but also in the interest of the bar at large," the brief proceeds: "We, the attorneys for the appellee here and in the court below, solemnly and deliberately assume this role. We have confidence in our judgment of men; we know that we are loyal to the ideals of our profession. We have better knowledge

of the appellee's character than have others; we and our own people will be affected directly and personally by his future status. With these considerations before us, and conscious of our responsibility, we solemnly vouch for his present moral character, and his future conduct. We respectfully ask the court to affirm the decree of the learned chancellor reinstating the appellee as a practitioner of law in Mississippi.''

I will put on one side the propriety vel non of this statement; I do not challenge its honesty and sincerity, and have given due weight to it. The appeal for clemency is a tribute to the hearts of my brethren who made it, and evidences their loyalty to friendship, than which ''nothing in the world is more excellent;'' but I cannot yield thereto. Judgment should be tempered with mercy when possible, but judges should never let their hearts outrun their heads. Neither can I give full value to the estimate of the petitioner's moral character there expressed, for friendship, if sincere, impels us, in the words of Emerson, to ''approach our friend with audacious trust in the truth of his heart; in the breadth, impossible to be overturned, of his foundations.''

The writing of this opinion has given me no pleasure. I deeply regret my inability to join my three associates in welcoming the petitioner back to the ranks of our great profession, but my conception of the truth and conscience forbid. I can do no other.

The decree of the court below should be reversed and the petition dismissed. But this cannot be done because three of the members of the court, one-half thereof, are of the opinion that the decree of the court below is correct. Brewer v. Crum, 111 Miss. 871, 72 So. 700.

It has been suggested that under section 26, c. 121, Laws of 1932, the trial in this court is de novo, and therefore the case is in the same attitude as if the petition for reinstatement had been originally filed in this court, from which it follows that the petitioner cannot be rein-

stated unless a majority of this court so say. In re Franklin (Miss.), 138 So. 307. This is true in part, for the judgment which the statute directs this court to render is that which, under its conception of the law and the facts, should be rendered. After giving this court the power to hear evidence not introduced in the court below, and providing that, "The rule that the Supreme Court will not reverse the judgment of the lower court on a question of fact unless it affirmatively appears upon the face of the record that the cause was decided contrary to the evidence shall not apply in cases arising under this act," the statute concludes as follows: "the supreme court shall be the final judge of the facts, and the judgment to be rendered thereon." But the statute further provides that "during the period of such appeal the disbarred attorney shall be prohibited from engaging in the practice of law in the courts of the state." This can only mean that the judgment of reinstatement shall not be effective while an appeal therefrom is pending, but that it does become effective when the appeal ends without another and different judgment being rendered by the Supreme Court. No judgment different from that of the court below can be here rendered because of the equal division of the court thereon; consequently, under the rule announced in Brewer v. Crum, supra, and uniformly followed since, the judgment of the court below must, of course, be affirmed.

I am requested by Judge ANDERSON to say that he concurs in all that I have here said.

McGowen, J., delivered a dissenting opinion.

As a member of this court, I am impressed, by a strong sense of duty, to put on record some conclusions which I have drawn in reference to the case at bar. Only a high sense of duty impels me to write herein; there being much more involved in the final judgment

about to be entered in this case than the mere fate of a single individual.

I am of the fixed opinion that the question presented to this court on this record is: Shall Marshall be reinstated because of his present good moral character? I think when the record in this case reached this court it was authorized only to consider this as a de novo case, one of which this court had original jurisdiction, in its inception, and which has not been lost, abrogated, or abridged by any act of the Legislature, and that section 26, c. 121, Laws of 1932, must be given this construction, or else the Legislature has transcended its power and deprived this court of its inherent right to function and preserve its decorum.

It is my view that our opinion rendered in the case of Steen, Marshall, and others, reported in 160 Miss. 874, 134 So. 67, held that, independent of statute, this court had inherent power and right to disbar and discipline an attorney who had offended to the extent that such was necessary to correct the evil. The authorities are there collated and cited, and it will not be necessary to repeat them. It is also my view of a rule of this court that only the court which exercises the power to disbar has the right and power to reinstate. See Ex parte Redmond, 159 Miss. 449, 132 So. 328. Any other conclusion would tend to disrupt the harmony of the courts, and would defeat that attuned symmetry and peace necessary to be preserved in courts of justice. This rule is supported in 6 C. J., p. 615, sec. 398. The inherent power in courts is as firmly fixed as part of their jurisdiction as if written in the Constitution; and, when the Constitution itself creates courts with certain jurisdiction, it just as certainly ascribes to these courts the power to freely function in the administration of justice, and courts cannot be deprived of those necessary inherent powers by a legislative fiat, or by any other power than that which shall be expressed affirmatively in the Consti-

tution or the fundamental law of the land. The Supreme Court of Mississippi, as such, is established by the Constitution of 1890. It is not within the power of the Legislature, as to this constitutionally established court, to abrogate or abridge any power vested by the Constitution, or any inherent power it has as such. See 12 C. J. 816, section 260.

By the judgment which it is indicated will be entered in this case, the inherent power of the court to discipline an attorney or officer thereof is surrendered and vested in the nisi prius courts, and this court is shorn of its inherent power to discipline and disbar if the occasion demands. In the case at bar, the power of this court, by the judgment affirming the decree of the court below, is now exercised as though the court was one of appellate jurisdiction and not a court of original jurisdiction in this behalf. If the statute is so construed, final judgment here is controlled by the decree of the court below. That decree is simply a finding of fact, and, by an equally divided court, we have the anomalous spectacle of a judgment of this court being set aside by a lower court, which will be construed by the bar as tantamount to an overruling of the Steen Case, supra.

In re Franklin (Miss.), 138 So. 307, three members of this court took the view that Franklin was guilty of conduct warranting and requiring his disbarment, while three members took the opposite position, resulting in the discharge and acquittal of Franklin. The affirmative could not prevail. There is no reason nor logic why the same rule should not apply to this case. Four judges cannot say that Marshall should be reinstated; therefore the affirmative loses, and, in my opinion, the petition should be dismissed. and no virtue or effect given to the decree of the chancery court in this case. By the statute that decree had no virtue whatever in this case until and when this court by its final unrestricted judgment on the facts in the record, or on other facts, put it in force.

Recurring now, as briefly as I may, to the main case, it is my view of this record that it demonstrates that the original decree of disbarment should be adhered to, and that the petitioner who fails to present to this court just cause for readmission should not be reinstated.

It is my view of the law applicable to cases of reinstatement or disbarment of attorneys, that the proof must be sufficient to overcome the court's former adverse judgment of the applicant's character. Plainly stated, the former judgment, which became final on March 7, 1932, was that the applicant's character was bad; that he was guilty of blackmail; that he said in his sworn testimony he gave the money to the so-called Jack Wilson, thus swearing falsely; and he permitted his stenographer to corroborate him in matters which the court did not believe, as stated in the opinion.

I am also of the opinion that it is necessary for such proof to rise to such dignity that it overcomes such a judgment. 6 C. J. 615, section 97. Proof of good moral character that would be sufficient to grant a license to an attorney is not sufficient on an application for a reinstatement where he has been disbarred, and the opinion of attorneys and friends that he has been sufficiently punished should not control a court's decision. See cases of In re Wellcome, 25 Mont. 131, 69 P. 836, In re Pemberton (Mont.), 63 P. 1043, and Matter of Clark, 128 App. Div. 348, 112 N. Y. S. 777, 779, where the court approved language peculiarly applicable to the facts in the case at bar, as follows: "We appreciate that Mr. Clark has presented to us the letters of many men, laymen as well as lawyers, urging his reinstatement. It is to his credit that a large number of his acquaintances in Genesee county, where he resided, vouch for the uprightness of his life since his disbarment. Many prominent lawyers testified before the referee in the disbarment proceeding to his high standing, and yet Clark did not deny the charges against him, culpable as they were. The wit-

nesses in his behalf, and the men now advising his restoration to practice may be influenced mainly by sympathy for the petitioner. They perhaps overlook the fact that the question has a broader significance than its personal aspect. If the possible benefit to the petitioner wer· the only effect of our action to be considered, we might yield to the recommendations and permit him to be reinstated. The effect of such a decision upon the profession, however, must be taken into consideration. His restoration would indicate a tendency on the part of this court to treat lightly the gravest of offenses, deliberately committed and persistently justified.''

I am profoundly impressed that the language of the New York court just quoted fits the facts of the case at bar, except that in the Clark Case the petition for reinstatement was filed two years after his disbarment, which fact should be considered. In the case at bar, on March 7, 1932, this court overruled Carl Marshall's suggestion of error, and before the month of June, 1932, had passed, we find his petition filed and evidence taken, and many witnesses who testified, in effect, that his character at and before that time, and since his disbarment, was good, and that such witnesses desired and recommended his reinstatement.

In my view, Marshall's sworn statement that he was disbarred by this court on a technical charge of blackmail displays his character and shows the real man. Blackmail is but another way of violating the Eighth Commandment, a moral concept and rule indorsed by practically all civilized nations as the correct principle of life. We said that Carl Marshall, in effect, was the high priest who secured from Craft eighty thousand dollars in ten thousand dollar bills, by playing upon Craft's fear and his great desire for his stolen papers which Latham had "tried to peddle," but failed, whereupon Carl Marshall went to Memphis, met Craft, and, having delivered to Craft the papers, for a part of which

Marshall waited until his associate, Latham, sent them to Memphis, as Craft would not pay the money to Marshall until full delivery of his papers to him was consummated, made a trade with Craft, and received from him the eighty thousand dollars. Latham could not dispose of the papers, but the petitioner did. When Marshall interviewed Craft in New Orleans, he was astounded that Craft was willing to pay twenty-five thousand dollars in the Durant lawsuit; and yet, before he (Marshall) had ever heard of "Jack Wilson," he demanded that Craf pay one hundred thousand dollars, and claims to have paid a goodly portion of the money received to said Jack Wilson in Memphis. And, although at the time there were large banks in Memphis, this eighty thousand dollars received, forsooth, must trail the entire state of Mississippi to a bank in Bay St. Louis to get change for a ten thousand dollar bill. Pages could be written upon the inconsistencies of this statement.

I have stated enough facts to demonstrate that this was no technical blackmail. No judge would disbar a lawyer upon a technical charge. The original disbarment was upon Carl Marshall's sworn evidence, after months of deliberation and preparation by him, and those who presented his case in this court. Is that false swearing a technicality? I think not.

The evidence of his friends of his repentance, and their belief in him, must be based upon the presumption that he has led them to believe that the charge was only technical.

He has, by this blackmail and the eighty thousand dollars extorted from Craft, bedaubed the state of Mississippi from Plum Point, on the Tennessee line, to Goose Point on the Southern border. He disgraced his profession, and he does not now realize that he was disbarred for a crime unworthy of a lawyer, but says he was disbarred for a technical crime.

I cannot recommend or judge such a man a worthy

member of the bar. He committed his crime deliberately, not in the heat of passion. His evidence was given in this court after months to ponder over the situation, and his whole course has been deliberate, unworthy, and defiant. Then, too, he retains the fruits of his wrongdoing and has never even suggested that restitution be made by him. If a man takes my money or goods from me and says, with his lips, that he is sorry, but retains my property or the fruits thereof, his vocal protestations are but as sounding brass and tinkling cymbals. The act belies the spoken word.

We said that Howie, who came into the possession of money innocently, but who held it wrongfully, it being his fee in the Durant lawsuit collected by Marshall, under threat of disbarment, must divest himself of this tainted money. By what rule of logic, reason, or right, justice, or equity or fair dealing, can Howie be forced to divest himself of money which he only held unlawfully, while Marshall secured the money unlawfully and retains it unlawfully, answering only, "I have no money," and is not asked to divest himself thereof? So far as I have read there has never been a greater scandal superimposed upon the bar and the people of our great state as is before us in the conduct of this unrepentant petitioner. They say that Marshall committed only one offense. I have called attention to his deliberation, to the long time after he was exposed, and to his letter to Latham, his partner in crime, all of which indicates that he was guilty of a grave offense. Much of the Holy Bible has been quoted to us. We need only to point to one outstanding case, Judas Iscariot. He did not sell his Lord but one time, and, so far as known, he was never brought into court. Is there a man of good judgment who will defend Judas? He had great remorse. Not so with Marshall. He is truer to himself, his friends and witnesses, than he is to the courts of this state.

So much for Sacred Writ. Benedict Arnold, a brilliant general in the Revolutionary War, did not sell his country but one time to England.

Could either Judas or Benedict Arnold be reinstated and receive a certificate of the highest courts of the state that these men were of good moral character and ought to be admitted as officers of the court? I think not.

The make-up of human nature carries with it the possibility of wrongdoing to one's self, and against human society. The means of retrieving, in any worth while degree, the personal loss and counteracting the social harm from wrongful acts is repentance; and the indispensable condition of forgiveness which is recognized by the moral judgment of mankind is repentance. There can be no eloquence on behalf of wrongdoing; "hypocrisy is the homage which vice pays to virtue." Fortunately, there is a restorative power for building a wasted life, and that power is true, genuine repentance, which is the beginning of the restoration of right within one's ruined self, and the beginning of the establishment of grounds for renewed public and judicial confidence.

Repentance concerns the three cardinal modes of personal being, knowing, feeling, and willing; acknowledgment of wrongdoing alone within itself is not repentance. This may be no more than defiance; sorrow alone for wrongdoing or crime, however deeply felt or voiced, is not ·repentance, for this may be only no more than remorse; and a will or resolution toward abandonment of evil is not repentance, for this may be but cautious prudence. True repentance involves total relationships, and genuine repentance is the admission of wrong uttered by the tongue, inspired by an honest spirit, repudiation of it, and the rectification of the wrong as far as possible. The petitioner, when faced with these, declares his allegiance to friends and self over against the courts, the law, and his brethern. His concept, carried to its logical conclusion, would destroy organized government, and undermine our social structure.

The stately majesty of personal honor, and the standard of public and judical morality, must be upheld. An acknowledgment of and repudiation of wrong, and, where necessary to correct and rectify a wrong inflicted upon corporate society, a frank and full confession, are all indispensable prerequisites to acceptance of repentance as genuine, and to setting aside the personal, social, and legal penalty imposed for wrong acts. Pardon and reinstatement cannot be constructively appropriated by one who keeps hidden, unconfessed, and unrequited, that which is necessary to rectification; and a determined resolve, at whatever cost of humiliation, to set things right, is the unquestioned evidence of genuine repentance.

Undertaking to uphold public security, or to re-establish self-respect and public confidence without these combined elements of true repentance, is more demoralizing than unwarranted and indiscriminate charity. There is no mercy in permitting the proud, defiant, unrepentant, to go on; mercy to such a one requires that he be given a chance to escape the continuous consequence of his wrongdoing, by knowing, within himself, that he has sincerely and honorably tried to do all within his power to contravene the results of his wrongdoing. It would be unmerciful to him, and injurious to society and the courts, to condone his offense and allow him to proceed as if no wrong had been committed.

An inexorable demand for true repentance is, in reality, good will working in behalf of the penitent; for to treat as superficial the fact of inward wrong and public offense, and accept outward suggestions void of evidence of true repentance, would be to leave the penitent without deliverance from moral obliquity and prevent that wholesome recovery which is essential to rehabilitation on the solid foundation of restitution and rectitude.

Life consists of mutual trust and public respect and confidence, and not of genius or personal, magnetic charm, but rests upon the bedrock of individual integrity

and social righteousness. Indeed, society can only be secure in its rights and liberties when it is understood that its unfortunate members who perpetrate willful crimes indicative of bad character, shall be expected—nay, required—to possess and show these elements of genuine repentance before they can enjoy the benefits of unmerited mercy. This exaction on the part of civilized society is not inhumanity, for it constitutes the only assuring ground of public security, personal recovery, and the rehabilitation of the offender to a sustaining position of public confidence.

Such is my concept of reinstatement to the bar of one who has fallen. So long as the petitioner deludes himself with the idea that his offense was not heinous, but only technical, he is without the pale of these simple statements of conditions prerequisite to his readmission among us.

In re Franklin, supra, the members of the court who discharged and acquitted him said, relative to Marshall, that he rode a ridge pole—he has not, to this date, dismounted; he rides on.

In effect, it is said that Carl Marshall is too great a lawyer, too brilliant, to remain disbarred. Conceding his ability for the sake of this opinion, and if the premise be true, the greater the reason for requiring him to be a living example, known and read of all men, that punishment is meted to the high and mighty as well as to the meek and lowly. Shakespeare, presumably, was not a lawyer, but, in poetry, he has delineated my view of Marshall and his crime, as follows:

"The baser is he, coming from a king,
To shame his hope with deeds degenerate,
The mightier man, the mightier is the thing,
That makes him honour'd or begets him hate;
For greatest scandal waits on greatest state,
The moon being clouded presently is miss'd,
But little stars may hide them when they list.

"The crow may bathe his coal-black wings in mire,
And unperceived fly with the filth away,
But if the like the snow white swan desire,
The stain upon his silver down will stay.
Poor grooms are sightless night, kings glorious day,
Gnats are unnoted wheresoe'r they fly,
But eagles gazed upon with every eye."