**IN RE PETITION OF LEO STALNAKER FOR REINSTATEMENT AS ATTORNEY AT LAW.**

9 So. (2nd) 100                                              En Banc
June 30, 1942

Whitaker Brothers, for appellant.

E. Calvin Johnson, Martin Carballo, Luther W. Cobbey, Chester H. Ferguson, Frank T. Phillips and J. Rex Farrior, for appellee.

CHAPMAN, J.:

On Dec. 2, 1930, Leo Stalnaker was by an order of the Circuit Court of Hillsborough County, Florida, suspended from the practice of law for a period of

twelve months and until such a day as he should have fully paid off, satisfied and discharged the indebtedness of $9,018.49 due by him to the guardian of Florine Brandon, a minor. On appeal to this Court the aforesaid order of suspension of Leo Stalnaker was affirmed. See Stalnaker v. State, 102 Fla. 638, 136 So. 318.

On December 2, 1941, Leo Stalnaker, by petition filed with the Clerk of the Circuit Court of Hillsborough County, Florida, applied for an order of reinstatement under the several provisions of Rule C, Section 8, adopted by this Court on January 27, 1941, and effective April 1, 1941, applicable to Circuit Court Commissions. See Rules of the Supreme Court, 145 Fla. 763, (text pages 805-6) ...... So. ....... Pertinent provisions of the Rule are viz:

"8. *Reinstatement.* (a) No person who has been disbarred or has resigned from the bar of Florida shall be reinstated unless he shall first file his petition for reinstatement with the Clerk of the Circuit Court of such county wherein he last practiced and maintained an office; and shall publish such notice as shall be fixed by the order of the circuit judge longest in service and able to act, requiring any one opposed to such reinstatement to appear and show cause why reinstatement should not be granted at a time fixed in the notice and order, and a copy of such order shall be served on the President of the Commission forthwith by the party seeking reinstatement.

"(b) Petitions for reinstatement shall be considered by the judges of the circuit sitting *en banc* and a majority shall constitute a quorum.

"(c) *By Supreme Court.* Upon a hearing of any petition for reinstatement of any disbarred or resigned

attorney, the petition, and any orders, notice and all written pleadings and motions shall be forwarded together with the findings or recommendations of the said circuit judge or circuit judges to the Clerk of the Supreme Court, and when ordered by the trial judge or judges a certified transcript of the proceedings of said hearing, whereupon same shall be progressed by the clerk as a cause for the consideration of said Supreme Court."

The petitioner represented that he had paid off, satisfied and discharged the indebtedness due Florine Brandon, an orphan girl, attached and made a part of the petition was a release signed by Lorine Evelyn Osborne, also known as Florine Brandon, who had on April 17, 1941, procured a court order removing her non age disabilities. The Circuit Court Commission of Hillsborough County filed an answer to the petition, and, while admitting that the petitioner had made a settlement of the indebtedness, the settlement was void because the petitioner had given to Florine Brandon the sum of $1,000.00 and deeded or conveyed to her some real estate of uncertain value; and that the settlement was not *bona fide* in that the petitioner took advantage of the distressed financial condition of Florine Brandon to obtain a satisfaction of the debt.

The attention of the Court was directed to and requested that it consider the entire record prior to reaching a decision in the cause.

Testimony was presented in support of the issues made and on final hearing the Honorable Harry N. Sandler, Circuit Judge, under the aforesaid Rule, made written recommendations to this Court. Pertinent statements made therein are viz:

"Since proceedings for the reinstatement of a suspended attorney partake as much of the nature of petitions for pardons as of ordinary law suits, I consider the propriety of requesting Honorable W. T. Harrison, Circuit Judge before whom the original proceedings were had, to appear before me and, at my request, he did appear and state that he was glad of the opportunity to do so as: 'the object in a hearing of this kind is merely seeking to do justice between a member who has been suspended or disbarred and the public and the bar as a profession.'

"The purpose of this proceeding is not to retry the petitioner for the misconduct which resulted in his suspension, but to determine whether or not at this time 'he has been sufficiently rehabilitated in his conduct and character to be safely readmitted to practice law and this question we must decide from the record as it exists before us at the time of the decision upon that question.' Ex Parte Marshall, 147 So. 791 (Miss.).

'One applying to the courts for reinstatement to practice law, after having been disbarred for misconduct, has duty to show court that he is at the time of such petition for reinstatement a person of good moral character whose conduct and reputation are such as to warrant his reinstatement as an attorney at law.' Branch v. State, 163 So. 48, 120 Fla. 666.

'Upon the whole we conclude that there should be no hard and fast rule upon the subject of restitution, but that each case should be considered and dealt with in the light of its own circumstances, bearing in mind that the aim of the court is to search the heart of the petitioner in order to arrive at a just judgment as to

his moral standards as shown in his conduct.' In re: Harris, 95 Atl. 761 (N. J.).

Other cases might be cited but these are indicative of the general rule on this subject.

On the subject of restitution the courts hold generally that restitution does not mean payment in full but means payment to the extent of one's ability to pay, honestly and fairly made.

'Ordinarily settlement will not be given much weight in determining the question of moral fitness for reinstatement since it may depend more upon financial ability than upon repentance or reformation.' State ex rel. Spillman v. Priest, 242 N.W. 433 (Neb.).

'We do not attach much importance as a rule to the matter of restitution, because that may depend more upon financial ability or other favoring circumstances than repentance or reformation. A thoroughly bad man may make restitution, if he is able, in order to rehabilitate himself and regain his position in the community; and a thoroughly good man may be unable to make any restitution at all. Repayment of the money wrongfully withheld is eminently proper, and especially so if done from a good motive, but it does not absolve the crime, or, in itself prove that the offender is inherently a better man.' In Re: Hawkins, 87 Atl. 243 (Del.). Neither on the other hand does restitution in full automatically constitute reinstatement. See, also, 6 C. J., Sec. 97.

"The general rule is that suspension on condition of repayment means according to one's ability and not merely payment in full. Suspensions on condition that money may be repaid are not unusual. It is true that in this case the settlement was small, approximately $1400.00, but the only evidence in the record

is that the petitioner was unable to do better at any time during the entire period of his suspension; and this is corroborated by the testimony of the guardian who stated that while he was not satisfied with the settlement that, after an investigation of the petitioner's financial ability, he was convinced that this was the best that could be done.

"While the purpose of disbarment and suspension is not solely one of punishment, yet that is one of the purposes. I have given careful consideration to the record in this case. I have considered carefully the objections of the Circuit Court Commission, which are based primarily upon the fact that the petitioner at no time made any effort to assist the minor in this case, but I fail to find in the record that he was at any time financially able to do so. There is no evidence before me of any misconduct or even criticism of the conduct of the petitioner since the date of his suspension. I am naturally impressed by the testimony of the judge who imposed sentence and who states that at the time of the hearing, which was brought as a disbarment proceeding, that 'the Court announced that it did not feel that it would be a proper case to permanently suspend or to disbar, but did feel that it was a case in which there should be a suspension.'

"The denial of the right to practice one's profession for more than eleven years is of itself no small measure of punishment. To me there is considerable force and logic in the following extract from one of Judge Bleckley's opinions:

'Society demands protection, but does not thirst for vengeance . . . In so far as human punishment is without necessity, it is without justification no

matter who may be its author or its minister.' Colbert v. State, 91 Ga. 711.

"While cases may be found to the contrary the practice of the Courts as a general rule is to favor reinstatement in cases of this kind. Numerous illustrations may be found cited in Ex Parte Marshall, supra.

"I find from the record in this case that the settlement though small was in accordance with the petitioner's financial ability and clearly and fairly understood by the parties involved. Also, that there is no evidence of any misconduct on the part of the petitioner since date of suspension.

"I, therefore, recommend that he be reinstated."

The application for reinstatement is heard here under the Rule *supra* by the Court sitting *en banc*. The record, inclusive of the testimony and written recommendations of the Circuit Judge on the merits, has been lodged here. The briefs, in compliance with the Rule, have been filed by counsel for the petitioner, the Hillsborough County Circuit Court Commission and the Hillsborough County Bar Association. Likewise exhaustive and oral arguments have been presented by counsel for the parties, when it developed that the attorneys engaged in the case were serving and rendering their services without compensation, and for the sole purpose of aiding and assisting the Court in reaching such a conclusion as will do justice to the bench and bar, the petitioner, and Florine Brandon, as well as the public. We acknowledge the invaluable assistance rendered by counsel in this controversy. The zeal and determination manifested to the effect that only men and women possessing a seasoned character and of approved integrity shall

practice law and assist in the administration of justice is not only to be commended, but encouraged by the judiciary of Florida and approved by the general public.

The words of this Court in an opinion prepared by Mr. Justice TERRELL in In Re: Petition State Bar Association Re: Proposed Court Rules, 134 Fla. 851, are here appropriate and are viz:

". . . We would not in the least minimize scholarship, but we do not consider it the most important part of a lawyer's equipment. It is important, of course, but in our zeal for scholastic attainment, we are overlooking and permitting to atrophy human attributes for which no amount of erudition will compensate. Let us say for example that seasoned character, a disciplined mind, industry and legal lore are the primary essentials of a good lawyer. Other essentials might be named, but I cannot conceive of a good lawyer without these and the secondary ones that are comprehended in them.

"Seasoned character has to do with one's appreciations. It is generated in an environment of stern realities and rigid discipline. It grows strong by surmounting obstacles, but degenerates if permitted to sail nothing but a smooth sea. The lawyer possessed of it appreciates the distinction between his own money and that of his client, and his conviction of that distinction is so intense that he will go hungry and suffer his loved ones to do likewise before he will misappropriate the latter. Seasoned character is gilt-edged collateral at the bank and is to the good lawyer what the foundation is to his home. It contemplates moral sense, that sense by which the lawyer conceives and imposes on himself a correct rule of conduct to

guide him in social and professional relations. It is by such a rule that he chooses between right and wrong and only through it that he is rescued from his own vices. It embraces intuition, the attribute in man that is akin to instinct in the lower animals and more than any other, made Marshal, Tanney, Miller, Harlan and White the greatest judges in this country. It is the most important factor in the lawyer's equipment; it holds honor and integrity above price, regards sacred the rights of others and is the only virtue that withstands recession and decay in man or society. A lawyer may be great without broad scholarship; he cannot be great without character and intuition. Seasoned character comprehends a sense of professional ethics which can be best improved by excluding from the profession all those with a tendency to a low standard of moral conduct. Failure in the observance of proper standards of professional conduct is more ruinous to the profession than ignorance of the law or lack of skill in its execution."

It is admitted by counsel of record that the twelve months period of suspension fixed by the order has expired. If the petitioner has paid or caused to be or otherwise returned to Florine Brandon the indebtedness in the sum of $9,018.49, with interest, then it legally follows that a *pro forma* order of reinstatement must be entered, because the terms of the suspension order dated December 2, 1932, have been complied with and discharged by the petitioner. Florine Brandon's release attached to the petition "acknowledges payment and settlement in full of all money and obligations due," while the Commission and its counsel point out that the settlement is spurious, and not *bona fide* and was obtained by the

petitioner for the sum of $1,000.00 and a conveyance of real estate of uncertain value and that the settlement *ipso facto* reflects the moral unfitness of Leo Stalnaker when asserting the fruits of an advantageous settlement obtained from a girl of tender years, an orphan, and at a time of financial distress.

The conclusion to be reached necessarily turns on the yardstick of measurement applied to the facts in controversy. Shall we return to the order of suspension and require that the petitioner pay the amount named, with interest, or shall he be required to return such a sum or sums as may be within his financial ability to pay? Several years have intervened since suspension and complete restititution has not been made. If he is required to return the money with interest, then it is shown that an order of reinstatement can not be obtained because of his financial inability to raise the sum. It was Judge Sandler's views that restitution meant the payment according to the extent of one's financial ability to pay. This rule is sanctioned by the weight of authority.

Judge Harrison, of the Twelfth Judicial Circuit, entered the suspension order dater December 2, 1932, and was called as a court witness. It was his conclusion that the order of suspension of the petitioner requiring that restitution should be made prior to the entry of an order of reinstatement as construed and interpreted by him meant "accord and satisfaction," or to satisfy or to make settlement with. The record discloses that several prominent and substantial people of the City of Tampa and environs appeared and gave testimony as to the good reputation of the petitioner. Argument is advanced to the effect that the money was obtained, invested and lost during the

"boom" period. Honorable Rex Farrior points out that the "boom" ended in the Spring of 1926 and the argument as to the loss of the money during the boom period is not sustained by the testimony.

If we hold that restitution must precede reinstatement, then a strong probability exists that the petitioner's suspension is permanent, which was not intended, and he is thereby forever precluded from resuming the practice of the law; if restititution precedes reinstatement, then we withhold the usual reward given to a fellow citizen for exemplary living; although the citizen may possess a contrite conscience and diligently strive to atone for the error of the past, but for the lack of money with which to make restitution he is branded as morally unfit to practice law; the doors of the temple of justice under such a ruling is forever closed to him. Such a rule is not only harsh or severe but unworkable. The more reasonable and just rule, which is sustained by the weight of authority, is to the effect that restitution in full need not necessarily precede reinstatement; that restitution means payment to the extent of one's ability to pay, honestly and fairly made. The latter rule was applied to the facts in controversy by Judge Sandler and we hereby hold that his conclusion is correct.

The recommendation made to this Court by the Honorable Harry N. Sandler, Circuit Judge, is hereby approved, ratified and confirmed by this Court. The petitioner, Leo Stalnaker, is hereby reinstated to the office of attorney at law and authorized to practice in all the courts of Florida.

It is so ordered.

BROWN, C. J., THOMAS and ADAMS, JJ., concur.

BUFORD, J., concurs specially.

WHITFIELD and TERRELL, JJ., dissent.

BUFORD, J., concurring specially:

I concur in the opinion by Mr. Justice CHAPMAN because the judgment of the Circuit on the original trial was one of suspension and not disbarment. It was never the intention of the Circuit Court to disbar Stalnaker. To deny his petitions for reinstatement would be in effect now to change the judgment from suspension to permanent disbarment.

The Circuit Judge who considered the application for reinstatement after a full hearing and careful consideration recommended reinstatement.

TERRELL, J., dissenting:

I regret that I find myself in disagreement with the majority opinion as prepared by Mr. Justice CHAPMAN. It proceeds on the theory that the petitioner has shown penance for the wrong he committed and having done so, to require restitution as a condition to reinstatement as an attorney would be too harsh and severe and would close the door against him.

The salient facts in the case are that in December, 1930, petitioner was on motion of the State Attorney as provided in Section 4172, Compiled General Laws of 1927, suspended from the practice of law for one year and until such time as he should fully discharge an indebtedness of $9,018.49 due Florine Brandon, also known as Evelyn Osborne. Florine Brandon was an orphan girl under ten years of age and received this money as a bequest from her grandfather. Petitioner was counsel for the guardian of Florine Brandon whom he induced to turn her money over to him without any security. He invested it in a real es-

tate project which turned out to be worthless. Both the procurement of the money and the investment were in clear violation of the law. No part of these funds or the interest thereon have ever been returned, hence the proceeding for disbarment against the petitioner.

At the time petitioner made his application for reinstatement, eleven years after he misappropriated his ward's money, he approached her and requested that he be released from his obligation on payment of $500. His offer was declined but she was at the time a young lady in college, was pressed for funds to complete her education, and after some haggling over the matter, she agreed to take a cash payment of $1000 and a deed to some property which was appraised at $400 and give him a release. In other words, on account of her financial embarrassment brought on by petitioner's wrong, and pressure on the part of petitioner, she felt impelled to accept $1400 for a claim that at reasonable interest amounted to $15,000 to $18,000, out of which she was required to pay the cost of removing her disability of non age.

In J. Carl Lambdin v. State of Florida, decided June 16, 1942, not yet reported, this Court approved the doctrine that the practice of law was affected with a public interest, that the relation of attorney and client was one of trust and confidence and that members of the Bar were nothing more than trustees of the public to execute this important trust. We also called attention to a standard of rectitude that attorneys would do well to pattern their conduct by as well as the brand of fidelity due by them to the State, to client, and the profession in their professional relations.

The majority opinion treats petitioner's wrong as a personal or private one. If the doctrine of the Lambdin case is sound, I think he is guilty of a public wrong that should not be satisfied in the manner proposed. It is comparable in its main aspects to a crime that the courts are not authorized to compose. If petitioner had been clerk in a grocery store and had appropriated its funds in the manner he did his ward's, he would have been prosecuted for embezzlement; if he had been cashier in a bank he would have been fired and prosecuted for misappropriating its funds; if he had been a tax collector, he would have been subject to suspension by the governor and if he had been a member of the legislature or the judiciary and had committed such an offense, he would have been subject to impeachment.

Public confidence in the bar demands equally as high standard of rectitude on the part of its members as it does of its officers, clerks, and cashiers. They are officers of the Court clothed with a public trust no less sacred than that vested in political officers and when abused, they should not be let off by the mere pronouncement that they are sorry for their wrong. In this case, petitioner does not proffer at any time to make good to the one he has defrauded but appears rather to think that he should be relieved from making restitution. Petitioner's ward was just as effectively deprived of her substance as if she had been robbed at the point of a gun. Whether done by hip pocket tactics or drawing room etiquette makes little difference to the one whose property is taken. The point is both methods are reprehensible and should receive just condemnation regardless of who is the perpetrator.

As a trustee of public trust, I don't know of any more sacred obligation that a lawyer can assume than that of safeguarding the morals and property of minor children, nor do I know of any obligation that exacts of him a higher degree of fidelity that it be faithfully executed. If such a trust can be undertaken and then abused in the manner that it was in this case and the miscreant whitewashed and relieved as he proposes, then the public can expect nothing in the way of security when property is placed in the custody of a member of the Bar. When its members "walk out" on the public in this manner, it would hardly take more to plant the seed of skepticism as to its integrity.

I do not think petitioner exemplified the slightest degree of penance for his wrong. For the eleven years of his suspension so far as the record discloses, he did not pay her a dime, exemplified no concern about her, and when he sought a release from her, his whole attitude was to drive the hardest bargain possible. I fail to find one element of the spirit of compromise or a promise of restitution in the future though it is asserted that he had an income of $1800 per year and house rent free during his suspension. He could have at least inquired about her and have thrown her some "chips and whetstones." I know of no better evidence of penitence than some form of restitution. It is sound in law, sound in morals, and sound in theology. It is highly commended in all these areas and to hold that it would be too harsh to require it under the facts in this case is in my judgment wide the mark of the standard of integrity that the public has a right to repose in the bar.

Aside from the matter of restitution and penance, I question the advisability of restoring petitioner to the practice of law. The law is very specific in the manner in which the funds of minors should be invested and protected. Section 5893, et seq., Compiled General Laws of 1927. I know of no authority for a trustee appropriating them in the manner done here. Petitioner was charged with knowledge of this, yet in the face of that knowledge, he deliberately violated the law and debased the trust imposed in him. It is no answer to say that others were doing it. Petitioner was charged with superior knowledge and his conduct not only destroyed the estate of a minor that he was under oath to safeguard but it had all the earmarks of embezzlement. For the sake of argument, eliminate every other consideration and say that he used bad judgment. I say that if this is a fair sample of his judgment, he should not be permitted to practice law.

The lawyer occupies the most strategic position in our social structure. He is the dominant factor in making, interpreting, and in executing the law. No public or private business runs without his counsel. The head of every corporation, political board and bureau has a lawyer at its beck and call. He is the guardian of minors, incompetents, and lunatics. He writes our wills and directs the management of our estates after we are dead. Some phase of every business transaction of any consequence requires the advice of a lawyer. We lean on him in trouble and in fact there is hardly an aspect of daily routine that at some time does not come under his scrutiny. Such is the way of a free democracy but when the trust imposed in the bar is flouted in the manner that it

was in this case, it is utter folly to think that a way will not be found to direct the business of the public through other channels. The bar as a class is the victim of such abuses and the great majority of it is intolerant of them. I think their effort to uphold correct professional standards should be upheld.

Public confidence in the bar will rise in proportion to the standard of rectitude it imposes on itself and certainly that standard must be in proportion to the responsibility it undertakes. Those who fail to rise to it should not be permitted to practice. I think the court below failed to sense this and that his recommendation to reinstate petitioner should be overruled and the petition denied. I think the fidelity of the bar to the public requires this.

I therefore dissent from the majority opinion. I am authorized to say that Mr. Justice WHITFIELD concurs in this dissent.

WHITFIELD, J., concurs.